## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| MATTHEW LUSK, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | **CLASS ACTION COMPLAINT** |
| LIFE TIME FITNESS, INC., BAHRAM AKRADI, GILES H. BATEMAN, JACK W. EUGSTER, GUY C. JACKSON, JOHN K. LLOYD, MARTHA A. MORFITT, JOHN B. RICHARDS, JOSEPH S. VASSALLUZZO, | ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

### NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff, Matthew Lusk ("Plaintiff"), individually and on behalf of all others similarly situated, respectfully files this Complaint against Life Time Fitness, Inc. (NYSE: LTM) ("Life Time" or the "Company") and Life Time's Board of Directors (the "Board" or "Individual Defendants" and collectively with Life Time, "Defendants"). This action arises out of Defendants' violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, in connection with a conflicted, "going-private" transaction (the "Proposed Transaction"), in which the Company will be sold to a consortium of investors led by Leonard Green & Partners, L.P.

("LGP"), LTF Holdings, Inc. ("LTF Holdings") and LTF Merger Sub ("Merger Sub") (collectively, the "LGP Group") at the unfair price of $72.10 per share (the "Proposed Consideration") through a materially false and misleading Proxy Statement. The Proposed Consideration for Life Time represents a mere 7% premium over the Company's trading price on March 13, 2015 – the last trading day before the announcement of the Proposed Transaction.

2.     Approval and adoption of the Proposed Transaction requires the affirmative vote of a majority of the voting power of all shares of common stock entitled to vote at a special meeting of the Company's shareholders. Unfortunately, Defendants appear unwilling to provide Life Time's shareholders with the information necessary to cast an informed vote on the Proposed Transaction, and have disseminated to them a materially misleading Preliminary Proxy Statement ("Proxy") in violation of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

3.     A critical aspect of the Proposed Transaction is the interest of Bahram Akradi ("Akradi"), Life Time's CEO and Chairman, in the corporate entity which survives the Proposed Transaction (the "Surviving Corporation"). Akradi stands on both sides of the Proposed Transaction: he is simultaneously Life Time's single largest investor, holding approximately 6.25% of the Company's outstanding shares, and also a material investor in the consortium which has aligned to purchase Life Time.

4.     The Company has made a partial disclosure that Akradi has signed a "Rollover Agreement" governing the exchange of $125 million worth of shares in the Company into shares in the Surviving Corporation and has disclosed that Akradi also

signed a "CEO Term Sheet" governing the terms of his continued employment as CEO of the Surviving Corporation.   These partial disclosures are materially incomplete and misleading, however, as the Company has not released the Rollover Agreement, disclosed its terms, or otherwise informed investors of Akradi's ownership percentage in the Surviving Corporation.[1]   It has disclosed certain terms of the CEO Term Sheet, but has not released all of its terms nor the agreement itself.   These omissions render the Company's partial disclosures materially misleading and deprive the Company's investors of (among other things) information necessary to assess potential conflicts of interest by Akradi, who was also lead negotiator of the deal.

5.     In addition, Life Time owns 70% of its 114 fitness centers, which are located in major metropolitan areas across the nation.   The majority of the owned properties have no mortgage attached.   As such, Life Time has significant real property assets but the value of these assets is opaque to the Company's investors because Life Time carries these assets on its books at <u>cost value</u>.   Neither the Proxy nor the Fairness Opinions referenced therein make any effort to appraise the current market value of Life Time's real estate holdings, although some independent analysts have suggested that the value of these real estate holdings would dwarf the Company's book value.   By recommending the Proposed Transaction and providing the cost value while failing to provide investors with an appraised value of the Company's real estate holdings, Defendants have omitted material information necessary to make the Proxy not

---

[1] The Proxy omits any details of Akradi's interest in the Surviving Corporation other than to disclose that he will "stay on" and that there will be an "equity rollover" by Mr. Akradi of $125 million of the Company's common stock.

misleading to investors attempting to evaluate the financial merits of the Proposed Transaction.

6.     The Proxy is also misleading because it fails to disclose pre-existing relationships between the Company's financial advisors for the Proposed Transaction, and members of the LGP Group.  For example, both financial advisors, Guggenheim Securities ("Guggenheim") and Wells Fargo Securities ("Wells Fargo"), were underwriters for the 2013 initial public offering of The Container Store, which was privately owned by LGP at the time.  In addition, Wells Fargo & Co., an affiliate of Wells Fargo, is a frequent participant in LGP investments.  By way of example, between 1990 and 1997, Leonard Green's investments have averaged an annual compound return of 81% for Wells Fargo & Co.  By failing to disclose these relationships and the attendant conflicts of interest they pose, Defendants have omitted material information necessary to make the Proxy not misleading to the Company's investors.

7.     Making matters worse, the Proxy contains only a highly truncated and incomplete description of the sales process, which fails to provide sufficient detail that would allow an investor to determine whether the merger negotiations achieved (or were intended to achieve) maximum value for investors' shares in the Company.  By way of example, the Proxy fails to identify any competing bidder and any details of competing bids, including financing and capital structure.  The Proxy also fails to disclose why "Party A" had "*open issues regarding Mr. Akradi's participation, employment and investment in a potential transaction*," what those open issues encompassed, and what effect those issues had upon the ultimate decision to reject Party A's bid for the

Company.  Without such disclosures, the Proxy omits material information necessary for the Company's investors to evaluate the sales process and the fairness of its ultimate outcome – rendering the Proxy materially misleading.

8.      Exacerbating the material deficiencies in the Proxy, the Agreement and Plan of Merger (the "Merger Agreement") effectuating the Proposed Transaction has been specifically designed to foreclose any further inquiry into the merger through the inclusion of burdensome deal protection provisions that benefit LGP Group but discourage third parties from conducting due diligence and submitting superior offers.  These protections include: (i) a strict no-solicitation provision prohibiting Life Time or any of its representatives from soliciting any competing offer; (ii) a provision that prohibits third parties from reviewing nonpublic information or engaging in discussions with the Company unless the third party submits an unsolicited written proposal and the Board concludes the proposal is superior to the Proposed Transaction; (iii) a requirement that Life Time immediately disclose to the LGP Group all pertinent information regarding competing proposals; and (iv) a provision requiring Life Time to pay the LGP Group a termination fee of $97 million and expenses of $7 million should Life Time ultimately transact with a superior bidder.

9.      Moreover, concurrent with the signing of the Merger Agreement, Akradi and the President of the Company have signed a "Shareholder Voting Agreement" which requires them to vote their shares of the Company in favor of the Proposed Transaction – even if the Board of Directors determines that merger is no longer in the best interest of the Company's shareholders.  Despite this tie-up of over 7% of the Company's insider

shares in favor of the Proposed Transaction, the Merger Agreement contains no requirement for a "majority of the minority" vote to pass the Proposed Transaction, and the LGP Group is given the right to "force the vote" if the Company's Board rescinds its endorsement of the merger – essentially abrogating their fiduciary duties to Life Time's investors.

10.    For these reasons and as set forth more fully herein, Plaintiff seeks to enjoin Defendants from proceeding with the Proposed Transaction.  In the event that the Proposed Transaction is consummated, Plaintiff seeks to recover damages from the Defendants for their violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder.

## PARTIES

11.    Plaintiff, Matthew Lusk, at all times relevant to this complaint has been a holder of Life Time common stock.

12.    Defendant Life Time Fitness, Inc. is a Minnesota corporation that maintains its corporate headquarters at 2902 Corporate Place, Chanhassen, Minnesota.  Life Time operates a chain of health fitness centers operating in the United States and Canada.  As of March 11, 2015, the Company operated 114 centers under the LIFE TIME FITNESS® and LIFE TIME ATHLETIC® brands.

13.    Defendant Bahram Akradi ("Akradi") is Chairman of the Board, President and Chief Executive Officer of Life Time.  Akradi founded Life Time in 1992 and has been a director ever since.  Akradi is Life Time's single largest investor, currently

holding approximately 6.25% of the Company's outstanding shares.  He is also a member of the LGP Group consortium attempting to acquire Life Time.  Akradi is a controlling shareholder of Life Time based upon his position and influence at the Company.  In the Form 10-K that it filed with the SEC on March 2, 2015, the Company recognized that "Mr. Akradi may be able to exert disproportionate influence over" Life Time.

14.    Defendant Giles H. Bateman ("Bateman") was elected a director of Life Time in March 2006, and currently serves as a director of Life Time.  Bateman was one of four co-founders of Price Club in 1976 and served as chief financial officer and vice chairman there until 1991.  Bateman served as non-executive chairman of CompUSA Inc., a publicly-traded retailer of computer hardware, software, accessories and related products, from 1993 until he retired in 2000.  Bateman serves as a director and the chair of the audit committee of WD-40 Company.  Within the last five years, Bateman also served on the board of directors of United PanAm Finance Corporation and the Tuesday Morning Corporation.

15.    Defendant Jack W. Eugster ("Eugster") was elected a director of Life Time in October 2009, and currently serves as a director of Life Time.  Eugster served as the chairman, president and chief executive officer of Musicland Stores Corporation, a retail music and home video company, for 21 years before his retirement in 2001.  Prior to Musicland, Eugster held executive leadership positions with The Gap, Inc. and Target Corporation.  He currently serves on the board of directors of three other public companies, Donaldson Company, Inc., Graco Inc., and Black Hills Corporation.  Within the last five years, Eugster has also served on the board of directors of Golf Galaxy, Inc.

16.    Defendant Guy C. Jackson ("Jackson") was elected a director of Life Time in March 2004, and currently serves as a director of Life Time.  In June 2003, Jackson retired from the accounting firm of Ernst & Young LLP after 35 years with the firm and one of its predecessors, Arthur Young & Company.  During his career, Jackson served as the audit partner on numerous public companies.  He also serves as a director, and the chair of the audit committee, of the following public companies: Cyberonics, Inc., Digi International Inc. and EpiCept Corporation.  Within the last five years, Jackson has also served on the board of directors of Urologix, Inc.

17.    Defendant John K. Lloyd ("Lloyd") was elected a director of Life Time in October 2009, and currently serves as a director of Life Time.  Since 1997, Lloyd has been the president of Meridian Health, a New Jersey-based integrated health system which encompasses five hospitals and an extensive network of non-hospital healthcare services.  Prior to Meridian Health, Mr. Lloyd held executive leadership positions with Jersey Shore University Medical Center, Modern Health Affiliates, Inc., and Episcopal Hospital.  He currently serves as chairman of the board of directors of QualCare Preferred Providers and QualCare Alliance Networks, Inc.  Within the last five years, Lloyd has also served on the board of directors of Commerce Bancorp, Inc., which was subsequently acquired by T.D. Bank Group.

18.    Defendant Martha (Marti) A. Morfitt ("Morfitt") was elected a director of Life Time in August 2008, and currently serves as a director of Life Time.  Since October 2009, Morfitt has been the chief executive officer of Airborne, Inc., a privately held manufacturer of dietary supplements.  Morfitt is the former president and chief executive

officer of CNS, Inc., a manufacturer and marketer of consumer healthcare products. She held this position from 2001 through March 2007. From 1998 to 2001, she was chief operating officer of CNS, Inc. Morfitt left her position at CNS, Inc. effective March 2007 as a result of the acquisition of CNS, Inc. by GlaxoSmithKline plc in December 2006. Prior to 1998, Morfitt held an executive position at the Pillsbury Company. Morfitt is also a director of Graco Inc.

19.    Defendant John B. Richards ("Richards") was elected a director of Life Time in October 2006, and currently serves as a director of Life Time. Richards is currently a managing partner of the New England Consulting Group, a firm specializing in creative marketing and growth strategies for a wide range of branded consumer businesses. Richards also serves as an interim consulting executive to various retail companies. Previously, he served as the president and chief executive officer of Elizabeth Arden Red Door Spa Holdings from October 2001 until May 2006. Richards also served as President of Starbucks Coffee Company, and held senior leadership and management positions with Four Seasons Hotels, Inc., Royal Viking Line, McKinsey & Company and The Procter & Gamble Company.

20.    Defendant Joseph S. Vassalluzzo ("Vassalluzzo") was elected a director Life Time in October 2006 and a lead director in October 2008, and currently serves as a director for Life Time. Since August 2005, Vassalluzzo has been an independent advisor to retail organizations, with a primary emphasis on real estate. From 1989 until August 2005, Vassalluzzo held executive and senior leadership positions with Staples, Inc., an office products retailer. Previously, Vassalluzzo has held management, sales, operations

and real estate positions with Mobile Corp., Amerada Hess Corp. and American Stores Company. Mr. Vassalluzzo is the non-executive chairman and a member of the Board of Trustees of Federal Realty Investment Trust, a publicly held real estate investment trust. He is also a director and a member of the nominating and governance committee and real estate committee of iParty Corporation, a publicly-held chain of party supply superstores.

## RELEVANT NONPARTIES

21.    Leonard Green & Partners L.P. is one of the nation's largest private equity firms with approximately $9 billion in equity commitments under management. Based in Los Angeles, Leonard Green invests across a range of industries. Significant current and former investments include: The Container Store, Shake Shack, Whole Foods Market, Topshop, J. Crew, Jetro Cash & Carry, Activision, CHG Healthcare, and PETCO. LGP leads the consortium of investors attempting to take Life Time private through the Proposed Transaction.

22.    TPG Capital, L.P. ("TPG") is a global private investment firm founded in 1992 with over $67 billion of assets. TPG has experience with global public and private investments executed through leveraged buyouts, recapitalizations, spinouts, growth investments, joint ventures and restructurings. The firm has experience with investments including Beringer Wines, Burger King, Chobani, J. Crew, Lenta, Neiman Marcus, PETCO, and Savers. TPG is part of a consortium of investors attempting to take Life Time private through the Proposed Transaction.

23.    LKN Partners ("LKN") is a private equity firm specializing in investments in consumer and retail businesses.  LKN is part of a consortium of investors attempting to take Life Time private through the Proposed Transaction.

24.    LTF Holdings, Inc. is a Delaware corporation that was formed by affiliates of LGP and TPG solely for the purpose of completing the Proposed Transaction and the related financing transactions.  LTF Holdings is currently controlled by investment funds affiliated with LGP and TPG.  Upon completion of the merger, Life Time will be an indirect, wholly owned subsidiary of LTF Holdings.

25.    LTF Merger Sub is a Minnesota corporation that was formed solely for the purpose of completing the Proposed Transaction and the related financing transactions.  Merger Sub is an indirect, wholly owned subsidiary of LTF Holdings and has not engaged in any business except for activities incidental to its formation and as contemplated by the Merger Agreement.   Upon consummation of the Proposed Transaction, Life Time will merge with Merger Sub, which will then cease to exist and Life Time will continue as the Surviving Corporation.

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa, because the claims asserted herein arise under sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a).   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).

27.    This Court has jurisdiction over each defendant named herein because each defendant is an individual, corporation or partnership which has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

## SUBSTANTIVE ALLEGATIONS

### Company Background

28.    In July 1992, Akradi opened the first Life Time Fitness center, roughly 30,000 square feet in size, in Brooklyn Park, Minnesota.  At the end of the year, the Brooklyn Park club had sold 2,702 memberships, was well established, and would go on to become one of the most profitable units in the Life Time chain.

29.    In the summer of 1996, Life Time completed an initial round of venture capital financing, receiving $6.5 million from Minneapolis-based Norwest Equity Partners.  With these funds, Akradi implemented his vision of building a chain of "big box" health clubs, using a model center that exceeds 100,000 square feet in size with a target capacity of 11,500 memberships.  The resort-style centers would be able to offer a wide variety of sports, fitness, and family recreation programs and services at rates below the industry average.

30.    Akradi would take Life Time public in 2004 and grow his chain of expansive, amenity-rich, "resort-style" fitness centers to 114 locations in upscale metropolitan areas across 24 states, with each new branch costing between $30 million and $50 million apiece, including real estate.  The Company made its 100,000-square-foot showplaces of fitness and vanity a common feature of top-tier retail districts in well-

off bedroom communities mostly in the middle of the country.  The chart below shows

the current United States locations of Life Time's fitness centers:



31.    This big box strategy paid off well for Life Time's investors, with the

Company's stock price climbing steadily over the years and trading in the $50.00 range

throughout 2014.

### Life Time's Real Estate Holdings

32.    As part of Akradi's "big box" approach to the health and fitness center, Life

Time began to accrue substantial real estate holdings in major metropolitan areas.  Life

Time owns 70% of its 114 centers, and the majority of the owned properties have no

mortgage attached.  As of May 2014, Life Time's real estate holdings were booked at

$2.3 billion; however, this number was calculated through cost-basis and other

accounting methods that are not reflective of the actual value of these assets (regardless

of whether it is, or is not, allowed under Generally Accepted Accounting Principles

("GAAP")).  The failure to disclose the Company's appraised real estate values, focused instead on the significantly lower book value, makes the Proxy materially misleading. For example, Life Time acquired a fitness center from Lifestyle Family Fitness in December 2011, but did not account for the property at an appraised value; instead, it accounted for the property at the purchase price, *i.e.*, cost of goodwill and assets.[2]

33.    At least one analyst has noted that the true value of Life Time's real estate holdings would be substantially greater than the Company's book value.[3]  Such a view is consistent with general real estate trends across the country since 2010, as real estate prices have increased 19 percent in major metropolitan areas since 2010:[4]



---

[2] Life Time Annual Report for fiscal year ended December 31, 2013 filed on Form 10-K, pp. 51-52.

[3] Michael Santoli, "Activist Hedge Fund Eyes Life Time Fitness, Makes Bold Founder Sweat," Yahoo Finance (May 23, 2014). Found at *http://finance.yahoo.com/blogs/breakout/activist-hedge-fund-eyes-lifetime-fitness--may-make-bold-founder-sweat-151316123.html.*

[4] Standard & Poor's Case-Shiller Home Price Index for 20 major metropolitan areas of United States.

34.    By 2014, the investment community had begun to take notice of Life Time's lucrative real estate holdings.  In May of 2014, Marcato Capital Management ("Marcato") — a hedge fund firm run by Richard "Mick" McGuire ("McGuire"), a former partner in Bill Ackman's Pershing Square Capital — disclosed an effective 7.2% stake in Life Time through share and stock option holdings.

35.    The emergence of Marcato as a major investor in Life Time was a clear signal to the market that a "land grab" was underway and Life Time's undervalued real estate assets were in play.  As one analyst reported: "most signs point to McGuire pushing for some financial engineering moves that could exploit the considerable value of Life Time's real estate."[5]  Kenneth Squire, founder of 13D Monitor, noted that Akradi has previously stated that the Company's real estate could have a market value of $2.8 billion, while the Company's net book value was only $1.4 billion.[6]

***The Sales Process***

36.    On July 30, 2014, Life Time received an unsolicited letter, and Mr. Akradi received an unsolicited telephone call, from undisclosed "Party A" proposing to purchase Life Time for an amount in excess of $60.00 per share in cash (the closing price of Life Time's common stock on July 30, 2014 was $40.57).

37.    The Company responded with defensive actions, adopting a shareholder rights plan to discourage a hostile takeover of Life Time and simultaneously announcing

---

[5] Michael Santoli, "Activist Hedge Fund Eyes Life Time Fitness, Makes Bold Founder Sweat."

[6] *Id.*

a review of strategic alternatives to increase shareholder value.   As stated in the Company's August 25, 2014 press release:

> Life Time Fitness, Inc. (NYSE:LTM), The Healthy Way of Life Company, announced today that its board of directors and senior management team have initiated a process to explore a potential conversion of real estate assets into a Real Estate Investment Trust (REIT).
>
> Based on a review of several strategic alternatives, the Company's board of directors believes that a REIT conversion could provide substantial benefits to the Company and its shareholders given its significant real estate holdings, while also supporting ongoing efforts to deliver innovative consumer and corporate health and wellness solutions as it executes its long-term growth plans.
>
> In connection with Life Time's evaluation of a REIT conversion, the Company's board adopted a shareholder rights plan to prohibit ownership of more than 9.8% of its outstanding shares in order to safeguard its ability to pursue a pro rata dividend in connection with a REIT conversion. The shareholder rights plan also protects against coercive or abusive takeover tactics and helps ensure that Life Time's shareholders are not deprived of the opportunity to realize the full and fair value of their investment. The rights will expire upon the earlier of August 21, 2015, or the first business day after the closing of the proposed REIT conversion.
>
> *     *     *
>
> There is no assurance that Life Time will change its current business plan or complete a REIT conversion. The Company does not expect to update the market with any further information on the process unless and until its board has approved a specific transaction or otherwise deems disclosure appropriate or necessary.

38.    The price of Life Time shares surged on the announcement of the prospective REIT transaction.   The Company's stock closed at $48.36 the day of the announcement, up from $41.60 the previous trading day.   One analyst who follows the Company, Feltl and Company, suggested the REIT transaction could push the price of Life Time's stock **_over $80 per share_** in a August 25, 2014 analyst report:

Life Time Fitness announced that it is in the process of reviewing a possible spinoff of its real estate assets into a REIT. We think this would create substantial value for LTM shareholders and the stock is up near 10% today on this news… This implies a combined value of $56 to over $80 per share for LTM stock that closed near $42 Friday and is presently just over $45 a share.

39.    Next, on September 5, 2014, Marcato corresponded directly with Akradi, stating, among other things, that at the **mid-point** of Marcato's valuation range, Life Time's common stock could reach a price of $70.00 per share upon separation of Life Time's real estate assets:

As you know, investment funds managed by Marcato Capital Management LP ("Marcato") own approximately 3.1 million shares of Life Time Fitness, Inc. … , making us the Company's largest shareholder. We commend the Company on its announcement on August 25th that it has retained financial and legal advisors to explore a potential conversion of its real estate assets into a Real Estate Investment Trust ("REIT"). Following the announcement, we received numerous in-bound calls from the investment community with questions regarding our view of the implications of the announcement and have reviewed reports by research analysts who cover the Company. ***In our opinion, many investors and analysts do not fully appreciate the transformational nature of the Company's announcement. Based on Marcato's analysis, at the mid-point of our valuation range, we believe the shares of LTM could reach $70 per share upon separation of the Company's real estate assets***. We are writing this letter to you and the board of directors (the "Board") to share this analysis and to offer suggestions for your consideration that we believe may help clarify any confusion in the marketplace.

We invested in the Company because we believed then, as we do now, that shares of LTM trade at a substantial discount to their fair value and this is due primarily to the nature of the Company's extensive real estate holdings. As a C-Corp operating in a consumer-facing industry, the Company faces two significant disadvantages versus other traditional real estate owners: a higher cost of debt and equity capital and corporate level tax obligations. Given the considerable size of the Company's real estate portfolio, steps that improve the capital and tax efficiency of the real estate strategy can create enormous value for shareholders. In the attached analysis, we lay out our assumptions of a hypothetical separation of LTM's

17

operating business from its real estate ownership business and the range of
values that we think these two businesses are likely to garner as
independent entities.

Additionally, we would like to share a number of recurring questions we
are hearing and our perspective on the likely answers.  We believe it would
be beneficial to the marketplace for the Company to provide more clarity
on these questions, when possible.

(Emphasis in original.)

40.    Shortly thereafter, on September 23, 2014, Party A sent Life Time a second

unsolicited letter, and again contacted Akradi via telephone, increasing its proposed price

to acquire Life Time to $70.00 per share in cash.

41.    On September 25, 2014, the Board met telephonically with representatives

of its financial advisors and legal counsel to discuss the revised proposal from Party A,

and at that meeting the Board determined to contact other potential interested parties.

Following that discussion, the Board authorized Life Time management, with the

assistance of the representatives of the Board's financial advisors, to begin a process of

contacting potential acquirors on a confidential basis to assess their interest in Life Time.

42.    At the direction of the Board, either representatives of the Board's financial

advisors (*i.e.*, Guggenheim and Wells Fargo) or Akradi initiated contact with 16 potential

bidders, including strategic bidders and financial sponsors (including LGP, Party A, and

"Party B"), over the next few months.  Akradi was heavily involved in the sales process

and negotiations from the outset, personally contacting certain of those potential bidders

with whom he had a pre-existing relationship.  Eleven of the potential bidders, including

LGP and LNK, executed confidentiality agreements (each of which contained "standstill"

restrictions that terminated upon Life Time's entry into the Merger Agreement) and proceeded with negotiations. While the Proxy discloses that standstill agreements were entered into, it fails to disclose whether they were "don't-ask, don't-waive" standstills that have been heavily disfavored by courts. This failure to disclose makes the statements regarding the standstills materially misleading.

43. On January 16, 2015, Party A submitted an indication of interest in response to the first-round process letter reaffirming its proposal of $70.00 per share, and LGP proposed a purchase price of $65.00 to $69.00 per share. Party B proposed a range of purchase prices, and on January 20, 2015, confirmed in writing a proposed purchase price of $60.00 per share. At a meeting on January 21, 2015, the Board reviewed the three indications of interest it had received and decided to continue negotiations only with Party A and LGP.

44. The Board then determined to forego the formation of a special committee and ceded almost total control over the sales process to Akradi based upon his representation that his interests were perfectly aligned with the interests of the Board in obtaining the highest price "reasonably available" for the Company. The Board further determined that Akradi should take the lead in encouraging additional bids. Akradi purportedly approached certain additional potential bidders, none of whom ultimately submitted proposals to acquire Life Time.

45. On February 2, 2015, LGP expressly conditioned its interest in an acquisition of Life Time upon Akradi "roll[ing] over" his shares of Life Time common stock into an interest in the Surviving Corporation. On February 3, 2015, Party A stated

that, while reaching a satisfactory agreement with management with respect to the rollover of management equity would be beneficial from Party A's perspective, this was not a prerequisite for its bid.

46.    On February 9, 2015, the Board agreed that Akradi and one senior representative of the Board's financial advisors would have further discussions with each of Party A and LGP to facilitate the sales process and the availability and terms of financing for each bidder.

47.    On February 26, 2015, the Board indicated that if Akradi wanted to present to any bidder specific terms on which he would participate and invest, or the capacity in which he would continue with Life Time after an acquisition, he could do so only after a Special Committee composed of purported independent directors was formed and after the terms were first reviewed by the Special Committee.  Akradi agreed that he would first present any such terms to the Special Committee when it was formed and that he needed until March 3, 2015 to develop his request.

48.    On February 27, 2015, LGP provided to Life Time a mark-up of a draft merger agreement provided to potential bidders.  Among other items, the mark-up included a condition that Akradi roll over certain of his shares of Life Time common stock and added a private equity-style financing structure.

49.    On March 3, 2015, the Board established the Special Committee, which elected Defendant Vassalluzzo as its Chairman.  The Special Committee permitted Akradi to negotiate the rollover of his equity in the Company and his continued employment at the Surviving Corporation with potential bidders.  The Special Committee

did not bother to retain independent legal or financial advisors. Instead, the Special Committee determined that the financial advisors and legal counsel to Life Time "could also serve as advisors to both the Board and the Special Committee."

50.    Also on March 3, 2015, with Life Time's permission, LGP contacted TPG, who was not previously a potential bidder, to act as a possible equity co-investor with LGP.

51.    On March 8, 2015, Party A and Akradi met again via teleconference in order to follow up on their March 5, 2015 discussion regarding proposed terms with respect to Akradi's participation, employment and investment in a potential transaction with Party A, which were substantially the same as the terms previously proposed to LGP. After a short discussion, Party A indicated to Mr. Akradi that it had "*open issues*" regarding Akradi's participation, employment and investment in a potential transaction and stated that it wished to discontinue any further such discussions until after a definitive merger agreement, if any, was entered into with Life Time. The Proxy is materially misleading as it fails to describe the "open issues" raised by Party A.

52.    On March 11, 2015, Party A's counsel sent Life Time's counsel an updated bid package that included a proposal letter reaffirming Party A's previously indicated purchase price of $70.00 per share, together with further revised drafts of the merger agreement and certain ancillary documents, including debt and equity commitment papers.

53.    Also on March 11, 2015, LGP sent the Company's legal counsel an updated bid package that included TPG as its principal co-investor in the transaction and included

a letter proposing a purchase price of $70.50 per share, together with a further revised draft of the merger agreement and drafts of certain ancillary documents, including debt and equity commitment papers, the voting agreement, and the contribution agreement providing for the rollover of certain of Mr. Akradi's equity in Life Time.  On March 12, Akradi met with LGP and TPG via teleconference, with the Defendants' legal counsel, to discuss proposed terms with respect to Akradi's participation, employment and investment in a potential transaction with LGP and TPG.

54.     Representatives of the financial advisors also communicated to LGP/TPG and Party A the expected timing for next steps, including that the Special Committee was scheduled to meet on March 13, 2015 and that, if the Special Committee determined to proceed with a transaction, the Special Committee would target signing and announcement of a transaction before the market opened on March 16, 2015.  Party A informed the representatives of the financial advisors that Party A might not be in a position to present a higher bid for Life Time within the Special Committee's short timeframe.

55.     Guggenheim then presented to the Special Committee an "Illustrative Analysis" of the value of *a hypothetical separation of Life Time's operating business from its real estate ownership business.*  According to the Proxy, this analysis was for "reference purposes only" and was not part of the formal valuation process.   In performing such analysis Guggenheim utilized a 2016 estimated EBITDA amount for each of the operating business and the real estate ownership business and applied selected EV/NTM EBITDA (as defined under "Opinions of Financial Advisors—Guggenheim

Securities") multiples. Guggenheim's analyses resulted in an overall combined present value reference range of ***$64.50 to $84.50*** per share for purposes of valuing Life Time's common stock. All other details of the foregoing analysis and its conclusions have been omitted from the Company's Proxy.

56. Wells Fargo also presented to the Special Committee an "Illustrative analysis" of the value of ***a hypothetical separation of Life Time's operating business from its real estate ownership business.*** According to the Proxy, this analysis was for "reference purposes only" and was not part of the formal valuation process. Wells Fargo's analysis was based on financial data and projections for the two businesses provided by, or approved for the financial advisors' use by, the management of Life Time, including (i) estimated existing 2015 and 2016 rent expense of $33 million and $34 million (both of which include $7 million of existing ground lease rent assumed by the real estate ownership business and charged back to the operating business), respectively; (ii) an additional $200 million in rent payable to the real estate ownership business by the operating business; (iii) a 1.5% annual rent escalator and an initial lease term of 15 years; and (iv) real estate ownership business general and administrative expenses of $15 million in the first year. Wells Fargo then added the illustrative ranges of per share values for the real estate ownership business and the operating business to calculate an illustrative range of combined values for the real estate ownership business and the operating business as of December 31, 2015. This analysis resulted in an illustrative range of combined equity values for the real estate ownership business and the operating business of ***$59.69 to $92.23*** per share. All other details of the foregoing

23

analysis and its conclusions have been omitted from the Company's Proxy, making it materially misleading.

57.    On March 13, 2014, the Special Committee discussed whether a failure of the LGP Group and Akradi to reach a definitive binding agreement as to the terms of the equity rollover could delay or otherwise affect their ability to proceed to execution of definitive agreements.  The Special Committee then authorized the representatives of the financial advisors to request that, in the interest of reducing potential execution risk, the LGP Group and Akradi proceed to finalize and execute a definitive contribution agreement.

58.    The Special Committee's March 13, 2014 meeting continued into the early evening. That afternoon, an executed contribution agreement pursuant to which Akradi agreed to an equity rollover of $100 million was delivered by the LGP Group's counsel to Defendants' legal counsel and circulated to the Special Committee.  Following receipt of the executed contribution agreement, the Special Committee authorized the representatives of the Special Committee's financial advisors and counsel to continue negotiations with the LGP Group. Representatives of the financial advisors reached out to the LGP Group, which agreed to raise their bid from $70.50 per share to $71.00 per share.

59.    During the morning of March 15, 2015, one of the representatives of the financial advisors was contacted by Party A and informed that Party A would be submitting a revised proposal at or around 11:00 a.m. The Special Committee scheduled a telephonic meeting at 12:00 p.m. to review any proposal submitted by Party A.

60.    Shortly before 12:00 p.m., Party A delivered its revised proposal to Defendants' legal counsel. The proposal provided for an increased offer of $72.00 per share and indicated that Party A would be willing to agree to any non-economic terms proposed by other bidders and viewed as superior by Life Time and its advisors to the terms contained in Party A's prior draft of the merger agreement. The proposal also stated that Party A was prepared to finalize definitive documentation that evening. The proposal by Party A did *not* include a rollover agreement for Akradi's shares and made no provision for his continued employment at the Surviving Corporation.

61.    Defendants' legal counsel contacted Party A and stated that the Special Committee had determined to seek best and final proposals from both bidders and that the Special Committee intended to make a final decision that evening. Defendants' legal counsel then contacted LGP's counsel, informing them that Life Time had just received an unsolicited higher proposal that the Special Committee would consider and that the Special Committee intended to make a final decision that evening.

62.    The Special Committee convened another telephonic meeting at 5:00 p.m. Defendants' legal counsel reported that Party A had reaffirmed its best and final bid of $72.00, noting that Party A's principal co-investor had confirmed in writing that all necessary internal approvals for the transaction had been obtained. Shortly thereafter, the LGP Group's counsel contacted Defendants' legal counsel and communicated a final bid of $72.10 per share. This bid also required an increased equity rollover by Akradi, for a total of $125 million. Conveniently, the LGP Group at this time submitted an executed rollover agreement reflecting an equity contribution by Mr. Akradi of $125 million (the

"Rollover Agreement").  ***Notably, neither the text nor the terms of the Rollover Agreement have been disclosed to the Company's investors in the Proxy, making statements regarding such agreement materially misleading.***

63.    The Special Committee then determined to pursue entry into a definitive agreement with the LGP Group.   After reviewing the fairness opinions ("Fairness Opinions") of both Guggenheim and Wells Fargo, the Board approved the sale of Life Time to the LGP Group (now including Akradi) on the evening of March 15, 2015 at a price of $72.10 per share at an aggregate value of about $4 billion.  After the meeting, Life Time and LTF Holdings executed the Merger Agreement and the various ancillary agreements.[7]

64.    Notably, neither of the Fairness Opinions attempted to appraise the value of Life Time's huge real estate holdings.   Nor did these Fairness Opinions reiterate the conclusions from the financial advisors' previous "Illustrative Analyses" based upon a hypothetical separation of Life Time's operating business from its real estate ownership business.  As discussed herein, those analyses (the details of which are omitted from the Proxy) showed that such a separation could result in a price for the Company stock as high as ***$92.23*** per share.  As such, the value of Life Time's properties, and any accretion in value since their purchase, were not taken into account by the Board of Directors when evaluating the transaction.

---

[7] Shortly after the announcement of the Proposed Transaction, Marcato liquidated its entire holdings in Life Time.

65.     The Proxy discloses property valuations based upon acquisition costs, not current valuation.  Current valuation, however, is likely much higher than acquisition costs.  Indeed, of Life Time's 114 facilities, 100 have been in operation for greater than three years.  During the ownership period, property values have increased significantly. Plaintiff estimates that 71 of Life Time's facilities are owned, greater than three years of age, and worth far more than the company's balance sheet indicates, yet this value goes unrecognized in the Board's analysis of the Proposed Transaction.

66.     In fact, the Fairness Opinion from Guggenheim which was relied upon by the Board in approving the Proposed Transaction conceded that "[i]n arriving at our opinion, we have not performed or obtained any independent appraisal of the assets or liabilities (including any contingent, derivative or off-balance sheet assets and liabilities) of Life Time or the solvency or fair value of Life Time, nor have we been furnished with any such appraisals."[8]

67.     Similarly, the Fairness Opinion of Wells Fargo (also relied upon by the Board) stated that, "[i]n arriving at our opinion, we have not made or been provided with any evaluations or appraisals of the properties, assets or liabilities (contingent or otherwise) of Life Time or any other entity."[9]

68.     Notably, among valuation experts it is commonly understood that the value of a business is intricately intertwined with that of its underlying real estate assets.  The business and real estate components of value are particularly connected if the real estate

---

[8] Proxy at p. C-2.

[9] *Id*. at p. D-2.

is a special-purpose property and a major asset of the business. Hotels, casinos, auto dealerships, marinas, cemeteries, theaters, and fitness centers are just a few of the many types of businesses that rely heavily on their underlying real estate.[10]

**The Sales Process was Infected with Serious Conflicts of Interest That Have Not Been Fully Disclosed**

69.     The process leading to the Proposed Transaction was flawed from the outset, with Akradi being allowed by a complacent Board to drive the process and negotiations – even though he stood on both sides of the transaction with interests adverse to the majority of Life Time's shareholders. Indeed, Akradi was negotiating on behalf of the Company's shareholders at the same time he was negotiating both the terms of his equity investment in the Surviving Corporation and the terms of his future employment with that company. To highlight this conflict, one needs to look no further than Akradi's terms of future employment. As explained in the Proxy:

> Mr. Akradi and the equity investors entered into a term sheet on March 13, 2015, which we refer to as the CEO term sheet, pursuant to which Mr. Akradi will serve as the Chairman of the Board, Chief Executive Officer, and President of Parent and Life Time for a period commencing on the closing of the merger and ending on December 31, 2020. The term sheet is legally binding, but will be replaced by definitive agreements to be negotiated by the parties in good faith.

> Pursuant to the term sheet, **_Mr. Akradi will receive an annual base salary of $1 million (pro-rated for 2015) and a guaranteed annual cash bonus of $1 million._** Mr. Akradi will also have the opportunity to receive an additional annual incentive cash bonus based on Life Time's performance.

---

[10]Don Wenk, "Business Valuation, Real Estate Appraisal or Both?" Kotzen Valuation Partners (Sept. 2003). Found at _http://www.kotzinvaluation.com/articles/businsess-real-estate.htm_.

*In addition to his cash compensation, Mr. Akradi will receive annual grants of shares of LTF Holdings' restricted common stock on April 1 in each of the first five years of his employment equal to 0.50% of LTF Holdings' common stock outstanding as of the closing of the merger (maximum of 2.5% in the aggregate over five years). A total of 50% of each grant will vest over five years, generally subject to Mr. Akradi's continued employment with Life Time (and accelerated vesting upon a change in control), and the other 50% of each grant will vest if Life Time achieves specified EBITDA targets. Mr. Akradi will also receive options to purchase common stock of LTF Holdings equal to 6.0% of LTF Holdings' common stock outstanding as of the closing of the merger, composed of three equal tranches. The options will vest over five years, generally subject to Mr. Akradi's continued employment with Life Time (and accelerated vesting upon a change in control).*

If Mr. Akradi's employment is terminated either by Life Time without cause or by Mr. Akradi for good reason prior to December 31, 2020, then Mr. Akradi will receive the following payments, subject to his continued compliance with specified non-competition and non-solicitation provisions during the 18 month period following his termination: (i) continued payment of his base salary for 18 months, (ii) payment of $1.5 million in respect of his guaranteed bonus and (iii) payment equal to 1.5 times the amount of his target annual incentive cash bonus in effect with respect to the year in which such termination occurs. If Mr. Akradi resigns from his position other than for good reason or is dismissed for cause, then the Leonard Green funds and the TPG fund will have the option to repurchase Mr. Akradi's investment in Parent, at cost.

(emphasis added).

70.     As such, Akradi, through the terms of his future employment and the cash out of his non-rollover shares, will receive 45% - 65% more value for equity holdings in the Company than unaffiliated shareholders will receive.  Specifically, Akradi currently owns approximately 6.25% of Life Time (2,439,928 shares) valued at $176 million (assuming the Proposed Transaction's purchase price of $72.10 per share).  He also agreed to reinvest $125 million of his holdings (1,733,703 shares), leaving $51 million in non-rollover shares that will be cashed out through the merger (666,225 shares).  In

addition, the terms of his employment with the Surviving Corporation provide that
Akradi will be awarded stock options worth 6% of the Company and grants of restricted
shares worth 1.25% - 2.50% of the Company.  Thus, as a result of the transaction Mr.
Akradi will receive the following (exclusive of consideration related to the rollover):

- $51 million in exchange for the sale of his non-rollover shares;
- $169 million worth of options controlling 6% of the Surviving
  Corporation's equity; and
- $35.2 million - $70.4 million worth of restricted shares.

71.    In short, Akradi will receive consideration, through the cash out of his non-
rollover shares and his continued employment, of approximately ***$255 to 290 million*** in
the Proposed Transaction.

72.    This does not account for the consideration received by Akradi pursuant to
the Rollover Agreement with the LGP Group, the terms of which have not been disclosed
to the Company's shareholders.

73.    Similarly, other executive officers and directors of the Company will
collect windfall profits from the Proposed Transaction, making them differently situated
than the Company's shareholders – giving these individuals an economic interest in the
Proposed Transaction far beyond the anticipated Proposed Consideration.  Specifically,
insiders and directors are entitled to, among other things, accelerated vesting of their
stock options as a result of the Proposed Transaction and the resultant change of control.
For example, outstanding shares of restricted stock, including shares of restricted stock
subject to time-based or performance-based vesting, will become fully vested and will be
considered to be an outstanding share of Life Time common stock for purposes of the

Merger Agreement that will entitle the holder to receive an amount of cash equal to the per-share merger consideration in accordance with the same terms and conditions as applied to holders of Life Time common stock generally, as depicted in the chart below:

| Directors | Shares of Restricted Stock (#) | Total Payment ($) |
|---|---|---|
| Giles H. Bateman | 4,295 | 309,670 |
| Jack W. Eugster | 4,295 | 309,670 |
| Guy C. Jackson | 4,295 | 309,670 |
| John K. Lloyd | 4,295 | 309,670 |
| Martha A. Morfitt | 4,295 | 309,670 |
| John B. Richards | 4,295 | 309,670 |
| Joseph S. Vassalluzzo | 5,368 | 387,033 |

| Named Executive Officers | Restricted Shares (#) | Total Value of Restricted Shares ($) |
|---|---|---|
| Bahram Akradi | 389,500 | 28,082,950 |
| Jeffrey G. Zwiefel | 82,900 | 5,977,090 |
| Eric J. Buss | 79,900 | 5,760,790 |
| Tami A. Kozikowski | 44,440 | 3,204,124 |
| Jess R. Elmquist | 17,500 | 1,261,750 |
| Michael R. Robinson | — | — |
| Erik A. Lindseth | 8,450 | 609,245 |

74.    With these special payments, all triggered by change in control, it is no surprise that the Board and Company management pursued a sale of the Company without safeguarding the interests of the Life Time's unaffiliated shareholders by, among other things, limiting Akradi's influence in negotiations, demanding a full and fair appraisal of the Company's massive real estate holdings, and engaging independent financial advisors not beholden to the LGP Group.

75.    Moreover, both Guggenheim and Wells Fargo were underwriters for the 2013 initial public offering of The Container Store, which was privately owned by LGP

at the time.  In addition, Wells Fargo & Co., an affiliate of Wells Fargo, is a frequent participant in LGP investments.  In fact, between 1990 and 1997, LGP's investments have averaged an annual compound return of 81% for Wells Fargo & Co.  These conflicts, which are not disclosed in the Proxy, further taint the entire sales process.

### THE INDIVIDUAL DEFENDANTS ISSUED A FALSE AND MATERIALLY MISLEADING PROXY IN VIOLATION OF FEDERAL LAW

76.    In an attempt to secure shareholder approval of the Proposed Transaction, Life Time filed with the SEC and disseminated to the Company's shareholders a false and misleading Proxy on March 16, 2015.  As detailed herein, the Proxy misrepresents and/or omits material information which renders the Board's recommendation in favor of the Proposed Transaction materially false and/or misleading, in direct contravention of sections 14(a) and 20(a) of the Exchange Act.

77.    *Disclosure Deficiencies Concerning the Sales Process:*  With respect to the sales process that led to the Proposed Transaction, the Proxy is materially deficient in that it fails to disclose:

(a)    The terms of Akradi's Rollover Agreement, including a complete accounting of his interests in the Surviving Corporation and any other consideration he received pursuant to his equity investment in the Proposed Transaction.  This information must be disclosed to the Company's investors to make the Proxy's partial disclosures not materially misleading. *See* 17 C.F.R. § 240.14a-101, Item 5 (requiring disclosure of "any substantial interest, direct or indirect, by security holdings or otherwise," of any officer in the matter to be acted upon).

(b)     The inducements or incentives offered to Akradi which caused him to increase his equity contribution to the Proposed Transaction from $100 million to $125 million.  This information must be disclosed to the Company's investors to make the Proxy's partial disclosures not materially misleading.  *Id.*

(c)     The actual value of Akradi's shares when his continued employment at the Surviving Corporation is considered.  As discussed herein, Plaintiff estimates that Akradi's holdings are worth significantly more than ordinary shareholders.  This information must be disclosed to the Company's investors to make the Proxy's partial disclosures not materially misleading.  *Id.*

(d)     The Identity of "Party A" and an explanation of Party A's "open issues regarding Akradi's participation, employment and investment in a potential transaction."  This information must be disclosed to the Company's investors to make the Proxy's partial disclosures not materially misleading.

(e)     Current appraisal of the fair market value of Life Time's properties and, if no appraisals have occurred, the likely current values based upon trends in regional real estate values for other properties.  This information must be disclosed to the Company's investors to make the Proxy's partial disclosures regarding the Company's value not materially misleading.

(f)     Guggenheim's Illustrative Analysis of the value of a hypothetical separation of Life Time's operating business from its real estate ownership business, which  resulted in an overall combined present value reference range of $64.50 to $84.50 per share for purposes of valuing Life Time's common stock.  This analysis, including

the 2016 estimated EBITDA amount for each of the Company's operating businesses and the real estate ownership business utilized therein, must be disclosed to the Company's investors in full to make the Proxy not materially misleading.

(g)    Wells Fargo's Illustrative Analysis of the value of a hypothetical separation of Life Time's operating business from its real estate ownership business, which resulted in a range of combined equity values for the real estate ownership business and the operating business of $59.69 to $92.23 per share. This analysis, including management's financial data and projections utilized therein, must be disclosed to the Company's investors in full to make the Proxy not materially misleading.

(h)    Pre-existing relationships between the Company's financial advisors for the Proposed Transaction, and members of the LGP Group. Specifically, both Guggenheim and Wells Fargo were underwriters for the 2013 initial public offering of The Container Store, which was privately owned by LGP at the time. In addition, Wells Fargo & Co., an affiliate of Wells Fargo, is a frequent participant in LGP investments. By way of example, between 1990 and 1997, LGP's investments have averaged an annual compound return of 81% for Wells Fargo & Co. These relationships must be disclosed to the Company's investors to make the Proxy not materially misleading.

78.    _Disclosure Deficiencies Concerning Guggenheim's Fairness Opinion_:  The Fairness Opinion of Life Time's financial advisor Guggenheim in the Proxy is misleading due to the following misstatements and omissions:

(a)    Guggenheim's Discounted Cash Flow ("DCF") analysis appropriately employs a weighted average cost of capital range of 7.5% - 8.5% and a

terminal EBITDA multiple range of 8.0x – 10.0x. However, the overall reference range ($52.50 - $79.50) is too wide to be useful to investors. A more realistic reference range needs to be disclosed to the Company's investors in order to make the DCF analysis not misleading.

(b)    The precedent transactions identified by Guggenheim are not representative of the Life Time sale. Relevant precedent transactions are generally those announced in the past five years, involve similarly sized companies in similar industries, and are subject to the same regulatory (tax) conditions. Guggenheim did not apply consistent criteria for selecting precedent transactions. The advisor stretched to find precedent transactions because there were not a sufficient number of relevant transactions to make a robust comparison. The selection criteria for precedent transactions, including: historical period, industry group, transaction size, and geography need to be disclosed to the Company's investors in order to make the Precedent Transaction analysis not misleading.

(c)    Guggenheim based its precedent transaction analysis upon *median* EV/ Last-Twelve-Month EBITDA multiples. The peer group analysis is based upon different metrics – *mean* one-year forward Price / Earnings and EV/ EBITDA multiples. However, Price/Earnings multiples are not appropriate for valuing a transaction as the buyer is acquiring equity *and* debt. Price/Earnings only accounts for a company's equity. In order to make this analysis not misleading to investors, the Company need to disclose: (i) the median one-year forward Price/Earnings and EV/EBITDA multiples; (ii) the

number of analyst estimates; (iii) the financial institutions responsible for the estimates; and (iv) the dates the estimates were created.

(d)     In the Peer Group Trading Analysis, the peers identified by Guggenheim are not representative of Life Time. Guggenheim created three baskets of peer companies – Healthy Living, Retail, and Leisure. Guggenheim identified 25 companies as peers of Life Time, but based upon market segment and company size only two of those companies (Weight Watchers International, Inc. and ClubCorp Holdings, Inc.) are comparable to Life Time. Moreover, Guggenheim's peer basket is identical to Wells Fargo's, making it appear as if the investment advisors collaborated on their fairness opinions. In order to make this analysis not misleading, the Company needs to disclose selection criteria for the Peer Group Trading Valuation Analysis, including: industry group, company size, and geography. In addition, the Company needs to disclose the degree to which Wells Fargo and Guggenheim collaborated in working on the Fairness Opinions.

(e)     The Peer Group Valuation is based upon the *mean* of unattributed analyst estimates of one-year forward EBITDA and earnings per share. This metric varies from Guggenheim's Precedent Transaction Analysis which is based upon *median* Last-Twelve-Month EBITDA and earnings per share. In addition, many of the selected peers are not closely followed by analysts. For example, the only recognizable investment bank covering Town Sports International Holdings, Inc. is Piper Jaffray & Co., while Citi is the only significant firm covering Nutrisystem, Inc. It is not appropriate to value a $4 billion transaction based upon a handful of unattributed and

undated analyst estimates.  In order to make this analysis not misleading, the Company needs to disclose: (i) the Median Last-Twelve-Month EV/EBITDA multiples of the selected peers; (ii) the number of analyst estimates; (iii) the financial institutions responsible for the estimates; and (iv) the dates the estimates were created.

79.    *Disclosure Deficiencies Concerning the Wells Fargo's Fairness Opinion*: The Fairness Opinion of Life Time's financial advisor Wells Fargo in the Proxy is misleading due to the following misstatements and omissions:

(a)    Wells Fargo's DCF analysis appropriately employs a weighted average cost of capital range of 7.75% - 8.75% and a terminal EBITDA multiple range of 8.5x – 9.5x.  However, the overall reference range ($56.26 - $72.55) is insufficiently constrained to be useful to investors.  In addition, the scope of this report does not include a review of the management forecasts used to generate Wells Fargo's DCF analysis.  In order to make the DCF analysis not misleading, the Company needs to disclose to the Company's investors a more realistic reference range and a review of management forecasts used to generate the DCF analysis.

(b)    The Selected Precedent Transactions identified by Wells Fargo are not representative of the Life Time sale.  Relevant precedent transactions are generally those announced in the past five years, involve similarly sized companies in similar industries, and are subject to the same regulatory (tax) conditions.  The precedent transactions identified by Wells Fargo do not fit those criteria and Wells Fargo did not apply consistent criteria in selecting precedent transactions.  In order to make this analysis not misleading, the Company needs to disclose the selection criteria for

precedent transactions, including: historical period, industry group, transaction size, and geography.

        (c)    Wells Fargo provides both mean and median values for EV/Last-Twelve-Month EBITDA multiples.  Wells Fargo does not provide one-year or two-year forward EV / EBITDA or Price/Earnings multiples for the precedent transactions; yet, it relies upon these metrics when comparing Life Time to existing peers.  In order to make this analysis not misleading, the Company needs to disclose: (i) mean and median one-year and two-year forward Price/Earnings and EV/EBITDA multiples; (ii) the number of analyst estimates; (iii) the financial institutions responsible for the estimates; and (iv) the dates the estimates were created.

        (d)    In the Selected Public Company Analysis, the peers identified by Wells Fargo are not representative of Life Time.  In addition, Wells Fargo's basket of peers is identical to those used by Guggenheim in its Peer Group Trading Valuation Analysis.  The selection of identical peers would only occur if either the peers were relevant, which they are not, or Wells Fargo and Guggenheim collaborated on the fairness opinions.  In order to make this analysis not misleading, the Company needs to disclose: (i) the selection criteria for the peer companies including: industry group, company size, and geography; and (ii) the degree to which Wells Fargo and Guggenheim collaborated on their Fairness Opinions.

        (e)    With regards to the valuation metrics in the Selected Public Company Analyses, Wells Fargo used two-year EV/EBITDA and Price/Earnings.  The entire peer analysis is based upon unattributed and undated analyst opinions.  In order to

make this analysis not misleading, the Company needs to disclose: (i) the range of Last-Twelve-Month EV/EBITDA multiples of the selected peers; (ii) the number of analyst estimates; (iii) the financial institutions responsible for the estimates; and (iv) the dates the estimates were created.

## CLASS ACTION ALLEGATIONS

80.    Plaintiff brings this action individually and as a class action on behalf of all holders of Life Time stock who are being and will be harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

81.    This action is properly maintainable as a class action.

82.    The Class is so numerous that joinder of all members is impracticable. Pursuant to the Merger Agreement, there are more than 39 million shares of Life Time common stock issued and outstanding as of March 31, 2015.

83.    There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)    whether Defendants have failed to disclose material information to stockholders in violation of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder in connection with the Proposed Transaction; and

(b)    whether Plaintiff and the other members of the Class will suffer irreparable injury if the Proposed Transaction complained of herein is consummated.

84.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

85.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

86.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class.

87.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

88.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## IRREPARABLE HARM

89.     Plaintiff has no adequate remedy at law.  Only through the exercise of the Court's equitable power will Life Time's shareholders be protected from the irreparable injury that would arise from losing the opportunity to cast an informed vote on this crucial transaction.

## CAUSES OF ACTION

## COUNT I
### Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9
### Against All Defendants

90.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

91.    The Company and its Board disseminated the false and materially misleading Proxy, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

92.    The Proxy was prepared, reviewed, and/or disseminated by the Board and Life Time.    It misrepresented and/or omitted material facts, including material information about the unfair and conflicted sales process, the inadequate consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company.

93.    The Company and its Board knew or should have known that the Proxy contained false and materially misleading statements and omissions, or were at least negligent in filing the Proxy with these false and materially misleading statements and omissions.

94.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them (and Plaintiff does consider them) important in deciding how to vote on the Proposed Transaction.    In addition, a reasonable investor would view (and Plaintiff does view) full and accurate

disclosures as significantly altering the "total mix" of information made available in the Proxy and other information reasonably available to investors.

95.     By reason of the foregoing, Life Time and the members of its Board have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

96.     As a result of the false and materially misleading Proxy, Plaintiff and the other members of the Class are threatened with irreparable harm, rendering money damages inadequate.

97.     Injunctive relief is appropriate to ensure the Proposed Transaction does not proceed until the false and misleading Proxy is amended and the Exchange Act violations are corrected.  In the event that the transaction is consummated prior to the entry of this Court's final judgment, Plaintiff will seek monetary damages

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.     The Individual Defendants acted as controlling persons of Life Time within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false and misleading statements contained in the Proxy, they had the power to influence and control and did

influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading statements in the Proxy.

100.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and the other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

101.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Board members to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy.

102.   In addition, as the Proxy sets forth at length, and as described herein, the Board members were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions of which had input from the Board.

103.   As set forth above, the Individual Defendants had the ability to exercise control over, and did control, a person or persons who have each violated section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, by their acts and omissions in connection with the false and materially misleading Proxy.

104.   By virtue of these facts, the Individual Defendants have violated and are liable to Plaintiff and the other members of the Class pursuant to section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHERFORE,** Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor and in favor of the Class and against all Defendants as follows:

(a)   enjoining, preliminarily and permanently, the Proposed Transaction unless and until Defendants fully comply with Section 14(a) of the Exchange Act and SEC Rule 14a-9;

(b)   in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(c)   directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their illegal activity;

(d)   awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(e)   granting Plaintiff and the other members of the putative Class such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

105.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs

and the Class demand a trial by jury.


Dated:  April 10, 2015                    **NICHOLS KASTER, PLLP**

                                          */s/ Kai Richter*
                                          Kai Richter, MN Bar No. 0296545
                                          Carl Engstrom, MN Bar No. 0396298
                                          4600 IDS Center
                                          80 South Eighth Street
                                          Minneapolis, MN  5402
                                          Telephone: (612) 256-3200
                                          Fax: (612) 338-4878
                                          richter@nka.com
                                          cengstrom@nka.com


                                          **BLOCK & LEVITON LLP**
                                          Jason M. Leviton*
                                          Mark A. Delaney*
                                          Joel A. Fleming*
                                          *pro hac vice application forthcoming*
                                          155 Federal Street, Ste. 400
                                          Boston, MA 02110
                                          Telephone: (617) 398-5600
                                          Fax: (617) 507-6020


                                          **THE WEISER LAW FIRM, P.C.**
                                          James M. Ficaro*
                                          *pro hac vice application forthcoming*
                                          22 Cassatt Avenue
                                          Berwyn, PA 19312
                                          Telephone: (610) 225-2677


                                          **RYAN AND MANISKAS LLP**
                                          Richard A. Maniskas*

*pro hac vice application forthcoming*
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
Telephone: (484) 588-5516

**Attorneys for Plaintiff**

## CERTIFICATION

I, Matthew Lusk, ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1.    Plaintiff has reviewed the complaint and authorizes its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary. I understand that is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4.    Plaintiff's purchase and sale transaction(s) in the **Life Time Fitness, Inc. (NYSE: LTM)** security that is the subject of this action during the Class Period is/are as follows:

| PURCHASERS | | | | SALES | | |
|---|---|---|---|---|---|---|
| **Buy Date** | **Shares** | **Price per Share** | | **Sell Date** | **Shares** | **Price per Share** |
| 3/16/2015 | 100 | 70.75 | | 3/6/2015 | 100 | 67.35 |
| 3/13/2015 | 200 | 66.249 | | 3/13/2015 | 100 | 66.50 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.    Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below_____.

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __9__ day of __APRIL__, 2015.

_Matthew W. Lusk_
Matthew Lusk