# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| MATTHEW LUSK and ST. CLAIR EMPLOYEES' RETIREMENT SYSTEM, | Civil No. 15-1911 (JRT/BRT) |
| Plaintiffs, | |
| v. | |
| LIFE TIME FITNESS, INC., BAHRAM AKRADI, GILES H. BATEMAN, JACK W. EUGSTER, GUY C. JACKSON, JOHN K. LLOYD, MARTHA A. MORFITT, JOHN B. RICHARDS, JOSEPH S. VASSALLUZZO, LEONARD GREEN & PARTNERS L.P., TPG CAPITAL, L.P., and LKN PARTNERS, | **MEMORANDUM OPINION AND ORDER ON MOTIONS TO DISMISS** |
| Defendants. | |

Kai H. Richter, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402; David T. Wissbroecker, **ROBBINS GELLER RUDMAN & DOWD LLP**, 655 West Broadway, Suite 1900, San Diego, CA 92101; Jason Leviton and Jacob A. Walker, **BLOCK & LEVITON LLP**, 155 Federal Street, Suite 400, Boston, MA 02110, for plaintiff Matthew Lusk.

Kai H. Richter, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402, for plaintiff St. Clair Employees' Retirement System.

Wendy J. Wildung, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, for defendants Life Time Fitness, Inc., Giles H. Bateman, Jack W. Eugster, Guy C. Jackson, John K. Lloyd, Martha A. Morfitt, John B. Richards, and Joseph S. Vassalluzzo.

Thomas P. Swigert, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for defendant Bahram Akradi.

Michele D. Johnson, **LATHAM & WATKINS LLP**, 650 Town Center Drive, 20th Floor, Costa Mesa, CA  92626; and Bret A. Puls, **FOX ROTHSCHILD LLP**, 222 South Ninth Street, Suite 2000, Minneapolis, MN  55402; for defendant Leonard Green & Partners L.P.

Christopher G. Green, **ROPES & GRAY LLP**, Prudential Tower, 800 Boylston Street, Boston, MA  02199; Martin Crisp, **ROPES & GRAY LLP**, 1211 Avenue of the Americas, New York, NY  10036; Bret A. Puls, **FOX ROTHSCHILD LLP**, 222 South Ninth Street, Suite 2000, Minneapolis, MN  55402, for defendant TPG Capital, L.P.

Frank A. Taylor, **BRIGGS & MORGAN, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN  55402, for defendant LKN Partners.


Plaintiffs Matthew Lusk and St. Clair County Employees' Retirement System ("St. Clair") (collectively "Plaintiffs") are former shareholders of defendant Life Time Fitness, Inc. ("Life Time").  This litigation relates to the purchase of Life Time by defendants Leonard Green & Partners L.P. ("LGP"), TPG Capital, L.P., and LKN Partners (collectively "Buyer Defendants") in Spring 2015.  Plaintiffs bring claims against Life Time; the individual members of its board of directors (collectively "Life Time Defendants"); the former CEO and founder of Life Time, Bahram Akradi; and the Buyer Defendants, alleging that they issued a false or misleading proxy statement prior to the buyout.  Plaintiffs allege violations of §§ 14(a) and 20(a) of the Exchange Act, breach of fiduciary duty, and aiding and abetting a breach of fiduciary duty.  All defendants now move to dismiss all claims.

Because Plaintiffs have not alleged a false or misleading statement in the proxy statement, the Court will dismiss their Exchange Act claims against all parties.  The Court rejects the Life Time Defendants' argument that the sale extinguished Plaintiffs'

right to bring a claim for breach of fiduciary duty and that statutory appraisal was Plaintiffs' exclusive remedy, and therefore, the Court will deny the Life Time Defendants' motion with regard to Plaintiffs' breach of fiduciary duty claim. However, Plaintiffs have not alleged sufficient facts suggesting that the Buyer Defendants knew of and substantially assisted any breach of fiduciary duty, and thus the Court will dismiss Plaintiffs' aiding and abetting claim against the Buyer Defendants. Accordingly, the Court will grant the Buyer Defendants' motion in full, and grant in part and deny in part the Life Time and Life Time Defendants' motion to dismiss.

## BACKGROUND

## I.    FACTUAL BACKGROUND[1]

Life Time is a Minnesota corporation that operates a chain of health fitness centers. (Am. Compl. ¶¶ 2, 12, Aug. 31, 2015, Docket No. 87.) Lusk and St. Clair were both holders of Life Time stock. (*Id.* ¶¶ 10-11.) Defendant Bahram Akradi founded Life Time in 1992, and he acted as its "Chairman of the Board, President and CEO." (*Id.* ¶ 13.) The seven named individual defendants[2] were members of Life Time's Board of Directors. (*Id.* ¶¶ 14-20.) Plaintiffs allege that Life Time had built up substantial value

---

[1] The Court considers the facts as pleaded in the Amended Complaint, as well as the proxy statement, which is properly considered as a public record referenced numerous times in the Amended Complaint. *See Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100, 1102 (8th Cir. 2000) ("On a motion to dismiss, a court must primarily consider the allegations contained in the complaint, although matters of public and administrative record referenced in the complaint may also be taken into account.").

[2] This includes Giles H. Bateman, Jack W. Eugster, Guy C. Jackson, John K. Lloyd, Martha A. Morfitt, John B. Richards, and Joseph S. Vassalluzzo. The group will be referred to collectively as "Life Time Defendants." (Am. Compl. ¶¶ 14-20, Aug. 31, 2015, Docket No. 87.)

in its real estate holdings; at the time of the buyout, "Life Time owned 70% of its 114 centers, and the majority of the owned properties had no mortgage attached." (*Id.* ¶ 31.) In May 2014, Life Time's real estate holdings were valued at $2.3 billion; however, Plaintiffs contend that this amount did not reflect the fair market value. (*Id.*)

In May 2014, Marcato, a hedge fund with 7.2% effective stake in Life Time, began pushing for Life Time to engage in a real estate investment trust ("REIT") reorganization. (*Id.* ¶ 32.) On July 21, 2014, Life Time hired Wells Fargo Securities to consider "various financing and strategic alternatives available . . . to maximize long-term shareholder value," including a possible REIT. (Decl. of Matthew B. Kilby ("Kilby Decl."), Ex. D ("Proxy") at 35-36,[3] Oct. 5, 2015, Docket No. 119; Am. Compl. ¶ 35.) On July 30, 2014, Life Time received an unsolicited acquisition proposal from Party A for over $60 a share, even though Life Time's closing price was $40.57 at the time. (Am. Compl. ¶ 35; Proxy at 36.) On August 25, 2014, Life Time announced that the Board would consider a REIT. (Am. Compl. ¶ 36; Proxy at 36.)

On September 5, 2014, Marcato publicly informed Life Time that at the midpoint of its valuation range, Life Time's stock could reach $70.00 per share upon separation of Life Time's real estate assets. (Am. Compl. ¶ 37; Proxy at 36.) On September 23, 2014, Party A increased its unsolicited bid to $70.00 per share. (Am. Compl. ¶ 40; Proxy at 36.) At a September 25, 2014, meeting, the Board gave Akradi and Life Time's financial advisors permission to begin contacting potential bidders. (Am. Compl. ¶ 40; Proxy at 36.)

---

[3] All citations to the proxy refer to internal pagination rather than CM/ECF pagination.

On January 16, 2015, Party A reaffirmed its offer of $70.00 per share, and LGP offered $65.00 to $69.00 per share.  (Am. Comp. ¶ 41; Proxy at 38.)   The Board considered these offers on January 21, 2015, and decided to continue negotiations.  (Am. Comp. ¶ 41; Proxy at 38.)   On February 2, 2015, LGP informed Life Time that its proposal was conditioned on Akradi "rolling over" his shares of Life Time stock; the next day, Party A informed Life Time that rollover of management stocks was not a prerequisite for its offer, but that it would be beneficial.  (Am. Compl. ¶ 42; Proxy at 38-39.)

On March 3, 2015, the Board established a Special Committee "to consider and evaluate possible strategic transactions outside of the ordinary course of business with the potential to increase shareholder value."  (Proxy at 40; *see also* Am. Compl. ¶ 43.)   The Special Committee "discussed their beliefs that potential bidders were more likely to submit the highest bids possible if they were permitted to discuss potential arrangements with senior members of Life Time's management team and that such discussions could be helpful in connection with arranging financing for a transaction."  (Proxy at 40.)

On March 5 and March 8, 2015, Akradi, along with the Chairman and the Special Committee's legal counsel as observers, met with Party A and Party A again stated that its offer was not conditioned on reaching an agreement with Akradi or management; Akradi's involvement in the transaction with Party A remained an "open issue" that would not be decided until after a merger.  (Proxy at 41; Am. Compl. ¶ 44.)

On March 11, 2015, LGP offered $70.50 per share and a rollover of equity from Akradi.  (Am. Compl. ¶ 46; Proxy at 42.)  Party A again indicated that it offered $70.00

per share.  (Am. Compl. ¶ 45; Proxy at 41.)  On March 12, 2015, Party A indicated that it would not be able to fund at a price higher than $70.00 per share during the time frame proposed by the Special Committee, which envisioned a definitive agreement before market open on March 16, 2015.  (Proxy at 42.)  The next day, LGP raised its bid to $71.00 per share.   (Proxy at 45; Am. Compl. ¶ 49.)   Negotiation over transaction agreements continued on March 14 and 15 between LGP and Life Time.  (Proxy at 45.)  On March 15, 2015, Party A delivered a revised proposal with an offer of $72.00 per share and also noted that it "would be willing to agree to any non-economic terms proposed by other bidders and viewed as superior by Life Time."  (*Id.*; Am. Compl. ¶ 49.)   The Special Committee then requested final bids from both parties by that evening, at which point Party A stayed with $72.00 per share, and LGP offered $72.10 per share.  (Proxy at 46.)  The Board approved the sale to LGP that day and announced it publicly the following day.  (Am. Compl. ¶ 52.)

Guggenheim Securities' illustrative analysis suggested that a REIT would have resulted in a present value range of $64.50 to $84.50 per share.  (Proxy at 43).  Wells Fargo Securities' illustrative analysis suggested a present value range of $59.69 to $92.23 per share for a REIT.  (*Id.* at 43-44.)  Both Guggenheim Securities and Wells Fargo Securities issued opinions that $72.10 per share was fair to shareholders.  (*Id.* at 47.)

Plaintiffs allege that Akradi's Rollover Agreement provided him with an equity rollover, annual base salary of $1 million and annual cash bonus of $1 million, and stock options, among other things.  (Am. Compl. ¶¶ 57-58.)  According to Plaintiffs, "Akradi stood to receive between 45% and 65% more value for equity holdings in the Company

than Life Time's public shareholders," totaling a "windfall" of $255 to $290 million.  (*Id.* ¶¶ 59-60.)  Plaintiffs also allege that "Akradi and the Buyout Group are already cashing in on the value of Life Time's real estate assets by selling individual properties," including "29 of its 114 fitness centers for $900 million on June 20, 2015, just ten days after the Buyout closed."  (*Id.* ¶ 74.)

Life Time filed the proxy with the SEC on April 30, 2015, and it was disseminated to the shareholders in advance of the shareholder vote on June 4, 2015.  (Am. Compl. ¶ 63.)  The 233-page proxy discussed the background of the merger, the Board's analyses and recommendations, the financial advisors' fairness opinions, and key terms of the Merger Agreement.  (*See* Proxy.)

The proxy disclosed for reference the estimated valuation ranges for a REIT transaction by both Guggenheim Securities and Wells Fargo Securities.  (Proxy at 43-44.) A six-page section entitled "Interests of the Directors and Executive Officers of Life Time in the Merger" included some information about Akradi's interests and his agreement to rollover stock and become part of the new ownership group after the buyout.  (Proxy at 72-78.)  However, the proxy did not contain estimated market values of Life Time's real estate holdings or the full terms of Akradi's rollover agreement.

The proxy also disclosed that the Buyer Defendants would raise some of the funds to pay shareholders by debt financing secured in part by a lien on Life Time's assets and a sale-leaseback of some Life Time real estate.  (Proxy at 80-82.)  In connection with this process, Life Time provided information on some of its real estate holdings to the Buyer Defendants and gave permission to give this information to banks and financing sources.

In accordance with SEC regulations, Life Time also made this information public in Form 8-K on May 18, 2015. (Kilby Decl., Ex. E.) This form was available prior to the shareholder vote, and it disclosed that "the total gross book value" of the portion of real estate reviewed was "approximately $1.4 billion, and the appraised value [was] approximately $1.9 billion." (*Id.* at 9.)

## II.    PROCEDURAL BACKGROUND

Lusk brought this action on April 10, 2015. On May 8, 2015, Lusk moved for expedited discovery and to enjoin the shareholder meeting in which shareholders were expected vote on the Life Time's sale. (Pl.'s Mot. to Enjoin, May 8, 2015, Docket No. 23; Pl.'s Mot. to Lift Discovery Stay, May 8, 2015, Docket No. 29.) On May 18, 2015, this Court denied his motion to seek expedited discovery, finding that he failed to show undue prejudice. (Mem. Op. & Order, May 18, 2015, Docket No. 46.) Lusk then withdrew his motion for a preliminary injunction. (Pl.'s Notice of Withdrawal of Mot. to Enjoin, May 18, 2015, Docket No. 47.)

St. Clair filed in state court on April 8, 2015, bringing derivative and direct claims under Minnesota law. St. Clair also moved for expedited discovery, which was denied on May 21, 2015. (Kilby Decl., Ex. F.) St. Clair voluntarily dismissed its state court action without prejudice on July 20, 2015, and joined the present action. (*Id.*, Ex. H.)

On August 31, 2015, Plaintiffs filed the present amended complaint. (Am. Compl.) They allege violations of federal securities law based on misleading statements in the proxy against Life Time and the Life Time Defendants, and against the Life Time

Defendants and Buyer Defendants as "controlling persons" for the company. (*Id.* ¶¶ 94-107.)   Plaintiffs also allege breach of fiduciary duty claims against the Life Time Defendants, (*id.* ¶¶ 108-112), and claims for aiding and abetting the breach of fiduciary duty against the Buyer Defendants, (*id.* ¶¶ 113-115).

Akradi, Life Time, the Life Time Defendants, and the Buyer Defendants all filed motions to dismiss on October 5, 2015.

## ANALYSIS

## I.   STANDARD OF REVIEW

In reviewing a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *See, e.g.*, *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation mark omitted).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.   "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops

short of the line between possibility and plausibility," and therefore must be dismissed. *Id.* (internal quotation marks omitted).

## II.     EXCHANGE ACT CLAIMS

First, Plaintiffs allege claims under § 14(a) of the Exchange Act and SEC Rule 14a-9 against Life Time and the Life Time Defendants.  Section 14(a) makes it unlawful to solicit proxies in violation of SEC rules.  15 U.S.C. § 78n(a).  Rule 14a-9 prohibits making a statement in a proxy

> which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to . . . the same . . . subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a).   Based on this law, to state a claim under § 14(a) and Rule 14a-9, a plaintiff must allege facts suggesting that the proxy (1) contained a false or misleading statement about a material fact, or (2) omitted a material fact necessary to make statements within the proxy not false or misleading or to correct any statement in an earlier communication that has subsequently become false or misleading.  *See Int'l Broadcasting Corp. v. Turner*, 734 F. Supp. 383, 390 (D. Minn. 1990) (discussing the elements of a claim under Rule 14a-9); *see also Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002) ("Thus, omission of information from a proxy statement will violate these provisions if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading.")

Exchange Act claims also face a heightened pleading standard based on the Private Securities Litigation Reform Act ("PSLRA").  *See* 15 U.S.C. § 78u-4(b).  "The PSLRA heightens the Federal Rule of Civil Procedure 12(b)(6) standard in two important ways."  *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 958 (8th Cir. 2008).  First, "the complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"  *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)).  Second, the plaintiff must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).

Here, Plaintiffs contend that Life Time violated § 14(a) and Rule 14a-9 by failing to disclose two pieces of information in the proxy: (1) "the actual market value of Life Time's real estate assets," (Am. Compl. ¶ 75 (emphasis omitted)); and (2) "the full terms of the Rollover Agreement" involving Akradi, (*id.* ¶ 84).  Life Time, on the other hand, argues that Plaintiffs claims must be dismissed because the omission of these pieces of information did not render any statements within the proxy false or misleading, and because the information itself was immaterial.  The Court agrees and will grant Life Time and the Life Time Defendants' motion with respect to these claims.

### A.    Real Estate Market Value

First, Life Time contends that Plaintiffs have failed to point to any particular statements rendered false or misleading by the omission of the actual market value of Life Time's real estate.  In response, Plaintiffs point to various statements within the proxy that they allege were rendered false or misleading by the omission, including statements that: (1) Life Time and the Board considered a REIT conversion transaction and that such a transaction could benefit shareholders,[4]  (Am. Compl. ¶¶ 65-72);  (2) the Board received an "illustrative analysis of the value of a hypothetical separation of [Life Time's] operating business from its real estate ownership business," (*id.* ¶ 70); (3) Guggenheim Securities' estimate that a REIT conversion would generate a per share value of $64.50 to $84.50, and Wells Fargo Securities' estimate that it would generate a per share value of $59.69 to $92.23 per share, (*id.*; Proxy at 43-44); and (4) Form 10-K, which was incorporated by reference into the proxy and "disclosed property valuations based upon Life Time's acquisition costs (*i.e.*, on a cost basis), but not the current market valuations that are likely to be much higher," (Am. Compl. ¶ 75).    These statements, however, cannot support Plaintiffs' claims.

---

[4] For example, the proxy states that the Board reviewed and assessed multiple options and that it hired Wells Fargo Securities to consider "various financing and strategic alternatives available to Life Time to maximize long-term shareholder value, including but not limited to the evaluation of a REIT conversion transaction."  (Proxy at 35-36.)  The proxy also states that the Board decided to explore a REIT conversion, and that "[b]ased on a review of several strategic alternatives, the Board believed that a conversion of Life Time's real estate assets into a real estate investment trust, or REIT, could provide substantial benefits to Life Time and its shareholders given its significant real estate holdings."  (*Id.* at 36.)

The proxy's disclosure that the Board and Life Time considered a REIT conversion and its benefits, and received an illustrative analysis regarding the potential impact, were not rendered false or misleading because the proxy did not also disclose the market value of Life Time's real estate holdings.  And Plaintiffs do not allege that the per share estimates from Guggenheim Securities or Wells Fargo Securities were false, that they were based on the acquisition costs rather than the actual market value of Life Time's real estate holdings, or that they were rendered false or misleading by the absence of the actual market value.  Finally, the property valuation disclosed in Form 10-K did not become false or misleading merely because the actual market value was not also disclosed.  While a "literally" true statement – a "so-called half-truth[]" – can "create a materially misleading impression" sufficient to "support [a] claim[] for securities fraud," *Freedman v. St. Jude Medical, Inc.*, 4 F. Supp. 3d 1101, 1121 (D. Minn. 2014), Plaintiffs have not established or even explained how the Form 10-K disclosure led to a reasonable inference that was false.  Simply put, Plaintiffs have not connected the dots to show how any statement within the proxy was rendered false or misleading by virtue of the omission of the actual market value of Life Time's real estate holdings.  If anything, the proxy's disclosure that the Board considered a REIT conversion, statements about the potential benefits of a REIT, and disclosure of estimated per-share ranges helped shareholders make a decision about whether or not to wait and seek a REIT conversion or to vote for the buyout.  Thus, Plaintiffs have failed to plead facts sufficient to establish that statements made in the proxy were rendered false or misleading due to the omission of the market value of Life Time's real estate holdings.

Alternatively, even if this claimed omission did render the above-described disclosures and statements false or misleading, Plaintiffs have not shown how the omitted information was material. A defendant only violates Rule 14a-9 if he or she "omits to state any **material fact** necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a) (emphasis added). With regard to § 14(a) liability, a fact is "material 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991) (quoting *TSC Indus., Inc. v. Northway Inc.*, 426 U.S. 438, 449 (1976)). Similarly, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus.*, 426 U.S. at 449.

Plaintiffs contend that many courts have found that the true market value of a company's real estate holdings is material; however, in most of those cases, courts found that the companies made affirmative and misleading representations about the value of their holdings, and thus omitted information that would have significantly altered the "total mix" of available information. In *Woodward & Lothrop, Inc. v. Schnabel*, for example, the court held that a corporation should have timely disseminated "factual data" about a discrepancy in a real estate appraisal it had previously disclosed  because this data was "an essential component of the 'mix' of information." 593 F. Supp. 1385, 1391, 1393 (D.D.C. 1984). Similarly, in *Virginia Bankshare, Inc. v. Sandberg*, the Supreme Court suggested that the effect of real estate appreciation could be found material, but

there, the proxy at issue explicitly described the proposed price "as offering a premium above both book value and market price." 501 U.S. 1083, 1904, 1098 (1991).[5]

Those cases are inapplicable here because the proxy did not make any representations about the market price of Life Time's real estate holdings or the fairness of the purchase price in relation to that market value. Moreover, Plaintiffs have neither pleaded nor argued that the REIT estimates by Guggenheim Securities and Wells Fargo Securities were incorrect or failed to take into account the actual market value of the company's real estate. And in fact, these estimates put shareholders on notice of the risks and rewards of a REIT conversion transaction – share prices as high as $84.50 or $92.23, or as low as $64.50 or $59.69. Plaintiffs have not explained how a disclosure of the actual market value of Life Time's real estate would have substantially altered the total

---

[5] Additionally, Plaintiffs cite *In re Bank of America Corp. Securities, Derivative, and ERISA Litigation*, in which the court found that undisclosed losses were material and suggested that omitting "the value of significant real estate holdings" could state a § 14(a) claim. 757 F. Supp. 2d 260, 306 (S.D.N.Y. 2010) (citing *Wilson v. Great Am. Indus.*, 855 F.2d 987, 994 (2d Cir. 1988)). However, in *Wilson*, the proxy statement had misrepresented that a particular property had no value, when in fact the property provided the company with significant tax benefits estimated to be worth over a million dollars. 855 F.2d at 994.

In another case cited by Plaintiffs, *Edick v. Contran Corp.*, the court found that nondisclosure of the value of real estate relating to a reverse stock split was sufficient to state a claim for breach of fiduciary duty, where the company admitted that "appraisals and comparable sales data . . . form[ed] the basis for [the company's] stated belief that the fair market value of certain real estate owned by [the company] or its subsidiaries 'substantially exceeds' its carrying value." 1986 WL 3418, at *1-3 (Del. Ch. Mar. 18, 1986). Additionally, in *Texas Partners v. Conrock Co.*, the Ninth Circuit found that the plaintiffs could have stated a claim based on failure to disclose that the real estate was likely undervalued where amendments were proposed to make a hostile takeover more difficult and a disclosure would have, among other things, helped shareholders assess the "importance" of the amendments. 685 F.2d 1116, 1118-19, 1121 (9th Cir. 1982). However, it is not entirely clear what information the plaintiffs in that case had about the value of the real estate, and thus, the extent to which the "total mix" of information was altered.

mix of information available. Indeed, shareholders were specifically apprised of potential outcomes of a REIT conversion transaction, and courts have rejected the notion that shareholders are "entitled to disclosures sufficient to make [their] own independent assessment of a stock's value." *Calleros v. FSI Int'l, Inc.*, 892 F. Supp. 2d 1163, 1175 (D. Minn. 2012). Thus, Plaintiffs' complaint fails to allege facts sufficient to support a finding that the omission from the proxy of information about the actual market value of Life Time's real estate was material.

In sum, Plaintiffs have not stated a claim because they have not adequately alleged that any statements within the proxy were rendered false or misleading by the omission of the market value of Life Time's real estate holdings, or, alternatively, that this omission was material.

### B.    Akradi's Rollover

The other basis for Plaintiffs' Exchange Act claim is the omission of the full terms of Akradi's Rollover Agreement. Life Time argues that Plaintiffs have once more failed to state a claim because the proxy contained extensive information about Akradi's personal interest in the Merger, and none of those statements were rendered false or misleading by the nondisclosure of the full terms of the agreement. Plaintiffs, by contrast, allege that the proxy provided an incomplete picture to investors and failed to disclose how Akradi's stake in the post-merger company would be calculated. (Am. Compl. ¶¶ 82-84.) Plaintiffs point to several specific statements as false or misleading based on the omission of the full terms of Akradi's Rollover Agreement. First, Plaintiffs

note the statement that shareholders "should be aware that certain of our directors and executive officers may have interests in the merger that are different from, or in addition to, your interests as a shareholder." (Proxy at 72.)  Additionally, the proxy states:

> Upon closing of the merger Akradi is expected to beneficially own an indirect interest in Life Time of between approximately 7.4% and approximately 7.7% without giving effect to any grants of restricted common stock of Parent or options to purchase common stock of Parent that Mr. Akradi is expected to receive following the closing of the merger as part of his employment agreement with Parent.

(*Id.* at 89.)  Plaintiffs also cite generally to the remainder of the discussion of the Rollover Agreement. (*Id.* at 73-74.)  Plaintiffs contend that these representations were rendered false or misleading because further details of the agreement were not provided.  In particular, Plaintiffs state that shareholders were not fully informed because they did not know how the range for Akradi's expected ownership interest – between 7.4% and 7.7% – was calculated, and what Akradi could do to increase his stake, especially considering the large monetary difference[6] between those two numbers.  (*See* Am. Compl. ¶ 83.)

Plaintiffs, however, fail to explain how these statements were rendered false or misleading because the full and precise details of the agreement were not provided.  Instead, Plaintiffs likely contend that Life Time's partial disclosure of Akradi's agreement created a duty to make a full disclosure.  But the cases cited by Plaintiffs do not support this proposition – they merely hold that if a proxy statement discloses something, it must do so honestly.  *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 830-31 (8th Cir. 2003) (acknowledging that "once the company chose to make

---

[6] Specifically, Plaintiffs allege that the difference between the top and bottom of the range is "$7.2 million to $8.4 million – over three times Akradi's annual salary and guaranteed bonus." (Am. Compl. ¶ 83.)

representations . . . there arose a duty to be truthful in that disclosure"); *Rand-Heard of N.Y., Inc. v. Dolan*, No. 14-3011, 2015 WL 1396984, at *6 (D. Minn. Mar. 25, 2015) (finding that where a party discloses material facts they assume "a duty to speak fully and truthfully on those subjects" (quoting *In re K-Tel Int'l Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002)), *rev'd on other grounds*, 812 F.3d 1172 (8th Cir. 2016).   While Plaintiffs seek to extend this principal and suggest that because the proxy stated any terms of Akradi's agreement, it had a duty to speak fully and disclose all terms, neither of these cases suggest that a lack of full disclosure is actionable unless the omission renders the underlying statements misleading or false.   *See Rand-Heard*, 2015 WL 1396984, at *6 (finding that statements suggesting future high earnings were actionable because the speaker knew that the company "would experience a sharp decline in revenues in the third quarter").

Plaintiffs also cite to *Shaev v. Saper*, where the court found that "the material terms of the incentive plan and general performance goals on which an executive's compensation is based must, at a minimum, be disclosed."   320 F.3d 373, 383 (3d Cir. 2003).   But in *Shaev*, the shareholders were voting on the compensation plan itself; thus, the court found "a proxy soliciting shareholders' approval of a proposed executive incentive compensation plan, which refers to an existing incentive plan, must disclose the material features of both plans," and state, "if determinable, the amount of the increased benefits and performance goals under the proposed plan."   *Id.* at 383-84.   Here, in contrast, the shareholders were not voting to approve Akradi's Rollover Agreement.

Alternatively, even if the statements within the proxy concerning Akradi's Rollover Agreement were rendered false or misleading by the omission of the full terms of the agreement, Plaintiffs still have not stated a claim because those terms were not material. The only specific omitted term that Plaintiffs have pointed to is how Akradi's share – between 7.4% and 7.7% – was calculated. But considering the total information available about Akradi's interest in the buyout, this information was not material. Shareholders had substantial information about Akradi's Rollover Agreement, *see Silberstein v. Aetna, Inc.*, No. 13-8759, 2015 WL 1424058, at *13 (S.D.N.Y Mar. 26, 2015) ("Shareholders substantially had the information that Plaintiff claims Defendants should have disclosed, and voted against the proposal while being aware of that information."), and the proxy painted a "sufficiently accurate picture so as not to mislead," *see Lane v. Page*, 581 F. Supp. 2d 1094, 1121 (D.N.M. 2008) ("A proxy statement need not reveal every detail involved in a transaction; it only needs to paint a 'sufficiently accurate picture so as not to mislead.'" (citing *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir. 1978)).

Because Plaintiffs have not sufficiently alleged that the proxy contained a false or misleading statement about a material fact, or omitted a material fact necessary to make statements within the proxy not false or misleading or to correct any statement in any earlier communication that has subsequently become false or misleading, their § 14(a) claim fails, and the Court need not address the parties' additional arguments about state of mind or causation. Moreover, because Plaintiffs have shown no prospect that they could state a viable claim if allowed to amend, the Court will dismiss these claims with

prejudice.  Plaintiffs had the opportunity in both their briefing and at the hearing to point to proxy statements rendered false or misleading by the claimed omissions, but failed to do so.  The Court can discern no basis for why an amendment to the complaint would be any different.

### C.    Section 20(a) Claim

Plaintiffs also bring Exchange Act claims against the Life Time Defendants and the Buyer Defendants under § 20(a), which imposes joint and several liability upon "controlling person[s]" of a primary violator.  15 U.S.C. § 78t(a).  To state a § 20(a) claim, a plaintiff must allege:

> (1) that a 'primary violator' violated the federal securities laws; (2) that 'the alleged control person actually exercised control over the general operations of the primary violator'; and (3) that 'the alleged control person possessed – but did not necessarily exercise – the power to determine the specific acts or omissions upon which the underlying violation is predicated.

*Lustgraaf v. Behrens*, 619 F.3d 867, 873-74 (8th Cir. 2010) (quoting *Farley v. Henson*, 11 F.3d 827, 836 (8th Cir. 1993)).  "The plain language of the control-person statute dictates that, absent a primary violation, a claim for control-person liability must fail."  *Id.* at 874.  Here, because the Court finds no primary violation under § 14(a) and Rule 14a-9, as described above, the Court will dismiss Plaintiffs' § 20(a) claims with prejudice as well.

## III.    BREACH OF FIDUCIARY DUTY

Plaintiffs bring a state-law breach of fiduciary duty claim, alleging that the Life Time Defendants allowed Akradi to hijack the sale and extract substantial benefits for

himself, failed to maximize shareholder value, and failed to disclose material information, among other bases. The Life Time Defendants now move to dismiss, arguing that Plaintiffs cannot pursue a breach of fiduciary duty claim because it is a derivative claim that was extinguished by the buyout, and also because statutory appraisal was Plaintiffs' exclusive remedy.[7] The Court rejects both arguments and will accordingly deny the Life Time Defendants' motion.

With regard to the Life Time Defendants' first argument, the parties dispute the proper test for determining whether a shareholder action is derivative or direct, based on somewhat conflicting Minnesota cases. The Life Time Defendants contend that to determine whether a claim is derivative or direct, the court applies what can be referred to as the "same character" test, where the court "consider[s] whether the injury to the individual plaintiff is separate and distinct from the injury to other persons in a similar situation as the plaintiff." *Nw. Racquet Swim and Health Clubs, Inc. v. Deloitte &*

---

[7] The Life Time Defendants' moving memorandum argues that Plaintiffs' breach of fiduciary duty claim should be dismissed on these two grounds. (Mem. in Supp. of Life Time Defs.' Mot. to Dismiss at 26-32, Oct. 5, 2015, Docket No. 117.) In their reply memorandum, the Life Time Defendants raise additional arguments that the claim fails because Plaintiffs did not identify any false or misleading statements, the Life Time Defendants are entitled to deference required under the business judgment rule, and independent directors do not have a duty to "maximize" shareholder value. (Life Time Defs.' Reply Mem. at 9-12, Nov. 23, 2015, Docket No. 130.) However, "[a] reply memorandum must not raise new grounds for relief or present matters that do not relate to the opposing party's response." D. Minn. L.R. 7.1(c)(3)(B). Courts generally do not "entertain arguments made by a party for the first time in a reply brief." *Redking Foods LLC v. Minn Assocs. LP*, No. 13-2, 2014 WL 754686, at *4 (D. Minn. Feb. 26, 2014) (quoting *Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, 491 F. Supp. 2d 871, 878 (D. Minn. 2007)) (collecting cases). The Life Time Defendants could have raised these arguments in their initial brief, but chose to focus on only its two initial arguments. Considering the brief discussion of these arguments in the Life Time Defendants' reply memorandum, and that Plaintiffs were not given a chance to respond, the Court will not consider these additional arguments at this stage. If they so choose, the Life Time Defendants may address them further after an answer is filed. *See* Fed. R. Civ. P. 12(c).

*Touche*, 535 N.W.2d 612, 617 (Minn. 1995).  Plaintiffs, on the other hand, point out that

in *Wessin v. Archives Corp.* ("*Wessin I*"), the Minnesota Court of Appeals explicitly

rejected this "same character" test and instead found that the critical inquiry was whether

the injury was direct to the corporation or the shareholders.  581 N.W.2d 380, 383-85

(Minn. Ct. App. 1998) (finding that "focus[ing] on a direct injury to the shareholder that

is distinct from the injury to the corporation is more consistent with the policies

underlying the direct-derivative distinction").  On appeal, the Minnesota Supreme Court

reversed, but did not explicitly state whether it agreed or disagreed with the appellate

court's rejection of the "same character" test.  *Wessin v. Archives Corp.* ("*Wessin II*"),

592 N.W.2d 460, 464 (Minn. 1999).  And in fact, the court appeared to apply the "direct

injury" test embraced in *Wessin I*, rather than the "same character" test.  *Id.* ("In

determining whether a claim is direct or derivative, we have focused the inquiry to

whether the complained-of injury was an injury to the shareholder directly, or to the

corporation.").  Since *Wessin II*, courts have not consistently applied either test.[8]

However, considering that *Wessin I* explicitly disfavored the "same character" test, and

the Minnesota Supreme Court in *Wessin II* only applied the "direct injury" test and did

---

[8] Many Minnesota courts have applied the "direct injury" test rather than the "same character" test.  *See In re Medtronic, Inc.*, No. A15-0858, 2016 WL 281237, at *3 (Minn. Ct. App. Jan. 25, 2016) (determining whether claim was direct or derivative by considering whether the injury was direct to the shareholder or to the corporation); *Blohm v. Kelly*, 765 N.W.2d 147, 153 (Minn. Ct. App. 2009) (same); *Stocke v. Berryman*, 632 N.W.2d 242, 247 (Minn. Ct. App. 2001) (same); *see also Weiner v. Naegele*, No. 11-855, 2012 WL 2906299, at *4 n.6 (D. Minn. July 16, 2012) (same).  However, other courts have applied the "same character" test or both tests.  *See Popp Telecom, Inc. v. Am. Sharecom, Inc.*, 361 F.3d 482, 492 (8th Cir. 2004) (applying "same character" test); *Staehr v. W. Capital Res., Inc.*, No. 10-1806, 2011 WL 2633894, at *4-5 (D. Minn. July 6, 2011) (citing both tests); *Ring v. Kaplan*, Nos. A11-804, A11-969, 2012 WL 763582, at *10 (Minn. Ct. App. Mar. 9, 2012) (applying both tests).

not address the appellate court's rejection of the "same character" test, the Court will apply the "direct injury" test here.[9]

Under this test, the Court finds that Plaintiffs have alleged injuries that are direct to the shareholders, rather than derivative of the corporation. Courts "look not to the theory in which the claim is couched, but instead to the injury itself." *Wessin II*, 592 N.W.2d at 464. The crux of Plaintiffs' claim is that the Life Time Defendants breached their fiduciary duty with respect to the merger, resulting in a lower price for shareholders. Because recovery for this injury would be to the shareholders rather than the corporation, this injury is direct and not derivative. *See, e.g., Parnes v. Bally Ent't Corp.*, 722 A.2d 1243, 1245 (Del. 1999) ("In order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price."). Thus, contrary to the Life Time Defendants' argument, Plaintiffs' breach of fiduciary duty claim was not extinguished by the buyout.

The Life Time Defendants also contend that even if Plaintiffs' claims are not derivative, they are barred because statutory appraisal was Plaintiffs' exclusive remedy. Under Minnesota law, a shareholder who has a right to appraisal does "not have a right at law or in equity to have a corporate action . . . set aside or rescinded, except when the

---

[9] Additionally, as discussed in *Wessin I*, the direct injury test "is more consistent with the policies underlying the direct-derivative distinction." 581 N.W.2d at 384; *see also Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004) ("In our view, the concept of 'special injury' that appears in some Supreme Court and Court of Chancery cases is not helpful to a proper analytical distinction between direct and derivative actions. We now disapprove the use of the concept of 'special injury' as a tool in that analysis.").

corporate action is fraudulent with regard to the complaining shareholder or the corporation."   Minn. Stat. § 302A.471, subd. 4.   "[T]he appraisal right . . . is [the plaintiff's] exclusive remedy **unless** the merger is 'fraudulent' to him [or her] or the corporation."   *Sifferle v. Micom Corp.*, 384 N.W.2d 503, 507 (Minn. Ct. App. 1986).   A plaintiff successfully states a claim under this "fraudulent" exception "if a complaint pleads with specificity that a merger was carried out through deception, misrepresentation, actual fraud, or in violation of applicable statutes or articles of incorporation, or in violation of a fiduciary duty."   *Id.*

The Life Time Defendants argue that although the court in *Sifferle* mentioned breach of fiduciary duty as a way to satisfy the fraud exception, not just any breach of fiduciary duty would suffice.   Instead, the Life Time Defendants argue that the breach of fiduciary duty must be pled with particularity and rise to the level of fraud, citing at least one Minnesota trial court decision that has held as much.   (*See* Kilby Decl., Ex. J.) However, the court in *Sifferle* clearly denominated a breach of fiduciary duty as a manner in which a merger could be fraudulent and explicitly stated that "the term 'fraudulent' . . . [should] be construed more broadly than strict common-law fraud."   *Sifferle*, 384 N.W.2d at 507.   Furthermore, the *Sifferle* court went on to consider whether the freeze-out merger "constitute[d] a breach of fiduciary duty by the majority and [was] therefore 'fraudulent' under Minn. Stat. § 302A.471, subd. 4."   *Id.*   Thus, while the court found that there was no breach of fiduciary duty under the facts of the case and Minnesota law, it did not suggest that something more than a breach of fiduciary duty was required to satisfy the fraudulent exception.   *Id.* at 507-09.   Finally, the Life Time Defendants do not provide

any later Minnesota Supreme Court cases suggesting otherwise.  The Court therefore finds that a sufficiently pleaded breach of fiduciary duty claim would fall within the fraudulent exception and avoid dismissal based on the statutory appraisal rights statute.

Because the Life Time Defendants argued that more than an ordinary breach of fiduciary duty was necessary for Plaintiffs to avoid the exclusivity of the statutory appraisal remedy, they did not address whether Plaintiffs' have sufficiently stated a breach of fiduciary duty claim in their opening brief, and thus, the Court will not consider the merits of their breach of fiduciary duty claim except to find that it is not barred by the exclusive statutory appraisal remedy, and survives this motion to dismiss.  Accordingly, the Court will deny the Life Time Defendants' motion to dismiss Plaintiffs' breach of fiduciary duty claim.

## IV.    AIDING AND ABETTING

Plaintiffs also allege that the Buyer Defendants aided and abetted the Life Time Defendants' breach of fiduciary duty.  To state a claim for aiding and abetting a breach of fiduciary duty under Minnesota Law, Plaintiffs must plead facts showing that (1) a third party breached a fiduciary duty causing injury to Plaintiffs, (2) the Buyer Defendants knew that the third party's conduct constituted a breach of duty, and (3) the Buyer Defendants substantially assisted or encouraged the third party in achievement of the breach of duty.  *Witzmen v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999).

The Buyer Defendants contend that Plaintiffs have failed to allege any facts supporting the second and third elements – whether the Buyer Defendants had actual knowledge of or substantially assisted a breach of fiduciary duty. These two elements are "evaluate[d]" together, and "where there is a minimal showing of substantial assistance, a greater showing of scienter is required." *Id.* at 188 (citing *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991)). "Whether the requisite degree of knowledge or assistance exists depends in part on the particular facts and circumstances of each case," including "[f]actors such as the relationship between the defendant and the primary tortfeasor, the nature of the primary tortfeasor's activity, the nature of assistance provided by the defendant, and the defendant's state of mind." *Id.*

In general, to satisfy the knowledge requirement, a plaintiff must show "actual knowledge" by alleging "specific facts" that the defendant knew the "tortious nature" of the third party's dealings. *Id.* This knowledge can be shown by circumstantial evidence, but only if it "demonstrate[s] that the aider-and-abettor **actually knew** of the underlying wrongs committed." *Varga v. U.S. Bank Nat'l Ass'n*, 952 F. Supp. 2d 850, 857 (D. Minn. 2013) (quoting *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244 (M.D. Fla. 2013)). To satisfy the substantial assistance requirement, a plaintiff must show "an 'affirmative step' on the part of the aider-and-abettor that is a 'substantial factor' in causing the breach of duty." *Id.* at 859 (internal citation omitted) (first quoting *Am. Bank of St. Paul v. TD Bank, N.A.*, 713 F.3d 455, 463 (8th Cir. 2013), then quoting *Camp*, 948 F.2d at 460). Courts consider "the nature of the act encouraged, the amount of assistance

given, the aider-and-abettor's presence or absence at the time of the tort, its relation to the primary actor, and its state of mind." *Id.*

Plaintiffs allege that the Buyer Defendants knew of the wrongful conduct because they were aware that Akradi continued to negotiate with them on Life Time's behalf and personally for his continued employment, and because they had an opportunity to review the proxy. However, "it is not enough to plead awareness of the conduct in question . . . [Plaintiffs] must plead facts plausibly suggesting [the Buyer Defendants were] aware of the **wrongfulness** of the challenged conduct." *Id.* at 858. Plaintiffs' allegations do not suggest the Buyer Defendants had actual knowledge of a breach of fiduciary duty during their negotiations based solely on the existence of the Rollover Agreement and Akradi's involvement in the transaction. Moreover, Plaintiffs' allegations do not suggest that the Buyer Defendants' provided substantial assistance in any breach of fiduciary duty.

Plaintiffs also allege that the Buyer Defendants assisted in the breach of fiduciary duty by negotiating with and recruiting Akradi. Plaintiffs cite only a Delaware chancery decision stating:

> An acquirer is free to seek the lowest possible price through arms' length negotiations with the target board, but "it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders."

*In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 837 (Del. Ch. 2011) (citing *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1058 (Del. Ch. 1984)). However, the Buyer Defendants point out that in that case, the bidder knowingly violated a confidentiality

agreement and secretly manipulated the sales process. *Id.*  Here, there are no comparable allegations.  Similarly, Plaintiffs cite *Malpiede v. Townson*, a Delaware case which found that "a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board," but also found that "a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting."  780 A.2d 1075, 1097-98 (Del. 2011).

Here, the facts alleged do not suggest exploitation, but rather, a "routine business transaction[]."  *Varga*, 952 F. Supp. 2d at 859 (quoting *Camp*, 948 F.2d at 459).  In particular, the fact that the Buyer Defendants increased their bid three times while competing with another buyer to secure the sale suggests an arm's length transaction.  Overall, Plaintiffs have not provided factual allegations suggesting that the Buyer Defendants knew of any tortious conduct or substantially assisted with any such conduct.

Thus, the Court will grant the Buyer Defendants' motion to dismiss Plaintiffs' state law aiding and abetting claim.  Because Plaintiffs could potentially remedy these defects with additional factual detail regarding knowledge and substantial assistance, the Court will dismiss this claim without prejudice.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the

1.    The Buyer Defendants' Motion to Dismiss [Docket No. 109] is **GRANTED**.

       a.     Plaintiffs' federal claim is **DISMISSED with prejudice**.

       b.     Plaintiffs' aiding and abetting claim is **DISMISSED without prejudice**.

2.    The Life Time Defendants' Motion to Dismiss [Docket No. 115] and Akradi's Motion to Dismiss [Docket No. 101] are **GRANTED in part** and **DENIED in part** as follows:

       a.     The motions are **DENIED** as to Plaintiffs' breach of fiduciary duty claims.

       b.     The motions are **GRANTED** in all other respects.

       c.     Plaintiffs' federal claims are **DISMISSED with prejudice**.

DATED:  September 30, 2016  
at Minneapolis, Minnesota.

                           s/ John R. Tunheim
_____

                            JOHN R. TUNHEIM  
                                Chief Judge  
                    United States District Court