UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MATTHEW LUSK and ST. CLAIR EMPLOYEES' RETIREMENT SYSTEM, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>BAHRAM AKRADI, GILES H. BATEMAN, JACK W. EUGSTER, GUY C. JACKSON, JOHN K. LLOYD, MARTHA A. MORFITT, JOHN B. RICHARDS, and JOSEPH S. VASSALLUZZO,<br><br>Defendants. | Civil No. 15-1911 (JRT/BRT)<br><br>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS** |

David T. Wissbroecker, **ROBBINS GELLER RUDMAN & DOWD LLP**, 665 West Broadway, Suite 1900, San Diego, CA 92101; Kai H. Richter, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402; Jeffrey C. Block and Jacob A. Walker, **BLOCK & LEVITON LLP**, 155 Federal Street, Suite 400, Boston, MA 02110, for plaintiffs Matthew Lusk and St. Clair Employees' Retirement System.

Thomas P. Swigert, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for defendant Bahram Akradi.

Matthew B. Kilby, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, for defendants Giles H. Bateman, Jack W. Eugster, Guy C. Jackson, John K. Lloyd, Martha A. Morfitt, John B. Richards, and Joseph S. Vassalluzzo.

Plaintiffs Matthew Lusk and St. Clair Employees' Retirement System (collectively "Plaintiffs") are former shareholders of Life Time Fitness, Inc. ("Life Time"). Plaintiffs bring this action individually and as a class action on behalf of all other similarly situated

former Life Time shareholders regarding the 2015 merger of Life Time with a group of private equity firms. Plaintiffs' sole remaining claim in this case is for breach of fiduciary duty against the former directors of Life Time's board.

Because Plaintiffs did not plead a non-exculpated breach of fiduciary duty claim against the former Life Time board, and because Life Time's shareholders ratified the transaction pursuant to Minn. Stat. § 302A.255, the Court will grant the defendants' motions for judgment on the pleadings.

## BACKGROUND[1]

### I. MERGER

Life Time is a Minnesota corporation that operates a chain of health fitness centers. (Am. Compl. ¶¶ 2, 12, Aug. 31, 2015, Docket No. 87.) Defendant Bahram Akradi founded Life Time in 1992, and he acted as its "Chairman of the Board, President and CEO." (*Id.* ¶ 13.) Defendants Giles H. Bateman, Jack W. Eugster, Guy C. Jackson, John K. Lloyd, Martha A. Morfitt, John B. Richards, and Joseph S. Vassalluzzo were members of Life Time's board of directors (hereinafter the "Board," and together with Akradi, the "Defendants"). (*Id.* ¶¶ 14-20.) Plaintiffs held Life Time stock prior to the merger at issue. (*Id.* ¶¶ 10-11.)

---

[1] The Court will consider the facts as pleaded in the amended complaint, as well as the facts discussed in the proxy statement (the "Proxy") – a matter of public record referenced numerous times in the amended complaint. *See Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100, 1102 (8th Cir. 2000) ("On a motion to dismiss, a court must primarily consider the allegations contained in the complaint, although matters of public and administrative record referenced in the complaint may also be taken into account."); (*see* Decl. of Matthew B. Kilby, Ex. D ("Proxy"), Oct. 5, 2015, Docket No. 119). All citations to the Proxy refer to internal pagination rather than CM/ECF pagination.

In response to pressure from a Life Time shareholder, on July 21, 2014, Life Time hired Wells Fargo Securities, LLC ("Wells Fargo"), (Am. Compl. ¶¶ 32, 35; Decl. of Matthew B. Kilby, Ex. D ("Proxy") at 7, Oct. 5, 2015, Docket No. 119), to consider "various financing and strategic alternatives available to Life Time to maximize long-term shareholder value, including but not limited to the evaluation of a [real estate investment trust ("REIT")] conversion transaction," (Proxy at 35-36). The concept of unlocking Life Time's real estate value through a REIT transaction also prompted an unsolicited acquisition proposal from Party A on July 30, 2014, for over $60.00 a share at a time when Life Time had a $40.57 per share closing price. (Am. Compl. ¶ 35; Proxy at 36.) In response, the Board also engaged Guggenheim Securities, LLC ("Guggenheim") to review and assess various financial alternatives to maximize shareholder value. (Am. Compl. ¶ 36; Proxy at 6, 36.)

On September 23, 2014, Party A increased its unsolicited acquisition proposal to $70.00 per share. (Am. Compl. ¶ 40; Proxy at 36.) At a September 25, 2014 meeting, "the Board decided to allow Akradi and Life Time's financial advisors to begin contacting potential bidders . . . . Akradi was heavily involved in these communications and personally contacted certain bidders with whom he had a pre-existing relationship." (Am. Compl. ¶ 40.) As Akradi and the Board continued to consider strategic alternatives, on January 16, 2015, Party A reaffirmed its offer of $70.00 per share, and a group of

private equity firms (the "Buyout Group")[2] offered $65.00 to $69.00 per share. (*Id.* ¶ 41; Proxy at 37-38.)

On March 3, 2015, the Board established a Special Committee "consisting entirely of independent and disinterested directors," (Proxy at 6), which "discussed various strategies and tactics for seeking to obtain the highest per-share cash bids for Life Time" and also considered a "REIT [c]onversion [e]xploration." (Proxy at 40; *see also* Am. Compl. ¶ 43.) The Special Committee "discussed their beliefs that potential bidders were more likely to submit the highest bids possible if they were permitted to discuss potential arrangements with senior members of Life Time's management team and that such discussions could be helpful in connection with arranging financing for a transaction." (Proxy at 40.) The Special Committee allegedly "permitted Akradi to negotiate the terms of a rollover investment and his continued employment at the surviving company with potential buyers." (Am. Compl. ¶ 43.)

On March 11, 2015, the Buyout Group offered $70.50 per share and a rollover of Akradi's equity in Life Time. (Am. Compl. ¶ 46; Proxy at 42.) Party A again indicated that it offered $70.00 per share. (Am. Compl. ¶ 45; Proxy at 41- 42.) Plaintiffs suggest that Akradi recognized a sale to the Buyout Group was his only chance to invest in the surviving company, and thus "quickly tipped the sales process in the Buyout Group's favor." (Am. Compl. ¶ 47.) On March 13, 2015, the Special Committee met with the financial advisors Wells Fargo and Guggenheim to discuss the two proposals as well as a

---

[2] The Buyout Group includes Leonard Green & Partners, L.P., TPG Capital, L.P, and LKN Partners. (Am. Compl. ¶ 1.)

REIT conversion. (Proxy at 42-43.) Guggenheim's analysis suggested that a REIT conversion would have resulted in a present value range of $64.50 to $84.50 per share, (*id.* at 43), and Wells Fargo's analysis suggested a range of $59.69 to $92.23 per share, (*id.* at 43-44). The Special Committee considered these analyses as well as the "uncertainties and risks associated" with a REIT conversion. (*Id.* at 44.)

Negotiation over the transaction agreements continued over the next few days. (*Id.* at 44-45; Am. Compl. ¶ 49.) On March 15, 2015, Party A delivered a revised proposal with an offer of $72.00 per share, but did not provide a rollover investment or continued employment for Akradi. (Am. Compl. ¶ 49; Proxy at 45.) The Buyout Group also submitted a bid of $72.10 per share and requested Akradi roll over $125 million in equity. (Am. Compl. ¶ 50; Proxy at 46.)

On March 15, 2015, the Special Committee and the Board both unanimously approved the merger with the Buyout Group. (Proxy at 48.) Life Time filed the Proxy with the Securities and Exchange Commission ("SEC") on April 30, 2015, and it was disseminated to Life Time shareholders in advance of the shareholder vote on the merger on June 4, 2015. (Am. Compl. ¶ 63; Proxy at 2.) The 233-page Proxy discussed the background of the merger, the Board's analyses and recommendations, the financial advisors' fairness opinions, key terms of the merger agreement, disclosed Akradi's rollover interest, and the Board's entitlement to stock options at the consummation of the merger. (*See* Proxy at 7-8, 27, 35-75.) In recommending Life Time's shareholders vote in favor of the merger, the Board and the Special Committee noted that Guggenheim and Wells Fargo opined the price of $72.10 was fair to shareholders. (Proxy at 48-49.) Not

including the Defendants' shares, the Life Time shareholders approved the merger with 81.65% voting in favor on June 4, 2015.[3]  Pursuant to the merger, Akradi rolled over $125 million worth of his Life Time shares in exchange for shares in the surviving entity, (Am. Compl. ¶ 50), and remained the CEO, (*id.* ¶¶ 57-58).

## II. PROCEDURAL BACKGROUND

On August 31, 2015, Plaintiffs filed an amended complaint alleging that Life Time and the Defendants issued a false or misleading proxy statement prior to the merger in violation of § 14(a) of the Securities Exchange Act and SEC Rule 14a-9, (*id.* ¶¶ 94-100), the Defendants and the Buyout Group acted as controlling persons of Life Time in violation of § 20(a) of the Securities Exchange Act, (*id.* ¶¶ 101-107), the Defendants breached fiduciary duties owed to Life Time's shareholders, (*id.* ¶¶ 108-112), and the Buyout Group aided and abetted the Defendants' breach of fiduciary duties, (*id.* ¶¶ 113-115).  All defendants moved to dismiss on October 5, 2015.

Subsequently, on September 30, 2016, the Court dismissed all claims except for the breach of fiduciary duty claim against Akradi and the Board.  *Lusk v. Life Time Fitness, Inc.*, 213 F. Supp. 3d 1119, 1137-38 (D. Minn. 2016).  The Court did not dismiss the claim primarily because the Defendants raised additional arguments in their reply memorandum, to which Plaintiffs were not given a chance to respond.  *Id.* at 1133

---

[3] As of the record date of the shareholder vote, 39,043,889 Life Time shares were outstanding, and 34,597,042 shares, or 88.61%, voted for the merger. (Def. Board's Answer, Ex. C at 2, Oct. 28, 2016, Docket No. 158.)  Akradi owned 2,499,928, or 6.4%, of outstanding shares, and the Board owned a total of 218,564, or .56%, of outstanding shares. (Proxy at 116.) Thus, not including the Defendants 6.96% of shares, the shareholders approved the merger with 81.65% voting in favor of the transaction. The parties do not dispute these calculations.

n.7. On October 28, 2016, the Defendants moved for judgment on the pleadings to dismiss the claim. (Def. Akradi's Mot. for J. on the Pleadings, Oct. 28, 2016, Docket No. 160; Def. Board's Mot. for J. on the Pleadings, Oct. 28, 2016, Docket No. 166.)

## DISCUSSION

I.  STANDARD OF REVIEW

Reviewing a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the Court applies the same standard as under a motion to dismiss pursuant to Rule 12(b)(6). *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). Therefore, when considering a motion for judgment on the pleadings under Rule 12(c), the Court is required to "'accept as true all factual allegations set out in the complaint' and to 'construe the complaint in the light most favorable to the plaintiff[], drawing all inferences in [the plaintiff's] favor.'" *Ashley Cty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (quoting *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)). Although a complaint need not contain "detailed factual allegations," it must contain sufficient factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In addition to the pleadings, the Court may properly consider materials that are necessarily embraced by the pleadings. *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004).

## II. BREACH OF FIDUCIARY DUTY

### A. Exculpated Breach of Fiduciary Duty Claims

The parties first dispute whether Plaintiffs' allegations state a non-exculpated breach of fiduciary duty claim against the Defendants.[4] Under Minnesota law, generally "[a] director's personal liability to the corporation or its shareholders for monetary damages for breach of fiduciary duty as a director may be eliminated or limited in the articles [of incorporation]." Minn. Stat. § 302A.251, subd. 4. There are, however, exceptions to this rule. Relevant to this case, Minnesota law dictates that the articles cannot limit a director's liability for a breach of the "duty of loyalty," "acts or omissions not in good faith," "intentional misconduct or a knowing violation of the law," or "for any transaction from which the director derived an improper personal benefit." *Id.*, subd. 4(a)-(e).

---

[4] The amended complaint refers to Akradi as an "'Individual Defendant[]' or [member of] the 'Board.'" (Am. Compl. ¶ 24.) The amended complaint also repeatedly states it seeks to hold Akradi accountable in his capacity as Life Time director – the pleading provides that the action relates to "the Board's breaches of fiduciary duty under Minnesota state law," (*id.* ¶ 1), was brought "against the members of Life Time's Board of Directors," (*id.*), and was filed "[a]s a result of the Board's breaches of fiduciary duty," (*id.* ¶ 9). The amended complaint **never** states that the breach of fiduciary duty claim against Akradi relates to his capacity as an officer of Life Time. (*See id.* ¶¶ 108-112.) Moreover, although Plaintiffs' responsive briefing states in a conclusory manner that, "[n]o officer in Akradi's position could have been influenced by an honest desire to serve the interests of the Company and its shareholders," (Pl.'s Mem. in Opp'n at 27, Nov. 21, 2016, Docket No. 178), the briefing did not otherwise raise any argument regarding Akradi's liability as a Life Time officer. Instead, Plaintiffs rely upon director liability cases to support their claim against Akradi. (*Id.* at 25.) The Court may reject an argument if framed as a "conclusory assertion" lacking any "analysis of the relevant law or facts." *See Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005). As Plaintiffs failed to provide any legal argument regarding officer liability, the Court will only address the claim against Akradi in his capacity as a Life Time director.

Since at least July 2004, Life Time's articles exculpated its directors to the fullest extent permissible under Minnesota law. (Def. Board's Answer, Ex. B at Art. IX, Oct. 28, 2016, Docket No. 158.) As the merger occurred after Life Time adopted the exculpatory provision, any breach of fiduciary claim against the Defendants sounding in "negligence or even gross negligence" arising from the merger fails as a matter of law because "such allegations would constitute only a breach of the exculpated duty of care." *Kococinski v. Collins*, 935 F. Supp. 2d 909, 917-18 (D. Minn. 2013). Plaintiffs argue they pleaded non-exculpated breach of loyalty and good faith claims against the Board and Akradi.[5] The Court will first analyze the claims against the Board, and then the claims against Akradi.

### B.  The Board

#### 1.  Duty of Loyalty

Under Minnesota law, the fiduciary duty of loyalty prohibits directors from serving "[their] own personal interests at the expense of the corporation and its stockholders." *Bartholomew v. Avalon Capital Grp., Inc.*, No. 09-1279, 2010 WL 3033727, at *3 (D. Minn. July 27, 2010) (quoting *Diedrick v. Helm*, 14 N.W.2d 913, 919

---

[5] Plaintiffs also assert that the Board breached a non-exculpable duty of acting in knowing violation of law pursuant to Minn. Stat. § 302A.251, subd. 4(b), because the Board allegedly failed to promptly form the Special Committee pursuant to § 302A.673, subd. 1(d)(1). However, Plaintiffs failed explain how § 302A.673, subd. 1(d)(1) applies to the instant action as Plaintiffs never alleged a person or entity was an "interested shareholder" for purposes of that statutory provision. *Id.*, subd. 1 (providing an issuing public corporation may not engage in any business combination with an "interested shareholder" unless approved by a special committee pursuant to the provisions of subdivision 1(d)). The Court therefore declines to address it. *Barnhart*, 421 F.3d at 750 (providing a Court may reject an argument when it lacks any "analysis of the relevant law.").

(Minn. 1944)). Plaintiffs' sole allegation that supports such a claim is that the Board was entitled to "accelerated vesting of their stock options as a result of the change of control that took place as a result of the Buyout." (Am. Compl. ¶ 61.) Plaintiffs explained that "[f]or example, outstanding shares of restricted stock, . . . entitled the holder to receive an amount of cash equal to the per-share merger consideration in accordance with the same terms and conditions as applied to holders of Life Time common stock generally." (*Id.*)

However, Plaintiffs' allegations support a finding that the Board's interest aligned rather than conflicted with Life Time's shareholders, as the Board was entitled to merger consideration with the "same terms and conditions as applied to holders of Life Time common stock." (*Id.*) Indeed, Delaware courts repeatedly hold that vesting of stock options during a merger is not a breach of the directors' duty of loyalty.[6] *See In re BioClinica, Inc. S'holder Litig.*, No. 8272-VCG, 2013 WL 5631233, at *5, (Del. Ch. Oct. 16, 2013) ("Plaintiffs' contention that the vesting of stock options in a change of control transaction implicates the duty of loyalty is frivolous. Delaware courts recognize that stock ownership by decision-makers aligns those decision-makers' interests with stockholder interests; maximizing price."); *see also Globis Partners, L.P. v. Plumtree Software, Inc.*, No. 1577-VCP, 2007 WL 4292024, at *9 (Del. Ch. Nov. 30, 2007) (noting

---

[6] There are very few Minnesota cases that interpret corporate fiduciary duties of loyalty or good faith, and generally Delaware decisions on pleading exculpated claims are persuasive. *See, e.g., Markewich ex rel. Medtronic, Inc. v. Collins*, 622 F. Supp. 2d 802, 809 (D. Minn. 2009) (citing Delaware cases for the proposition that plaintiffs have "the more difficult burden of pleading a non-exculpated claim to avoid dismissal"); *Rupp v. Thompson*, No. C5-03-347, 2005 WL 2757129, at *6-8 (Minn. Dist. Ct. Jan. 12, 2005) (discussing several Delaware cases regarding duty of loyalty and good faith). Thus, when relevant, this Court will also consider Delaware law.

although "the acceleration of unvested options could be viewed as an inducement to effectuate the Merger," it "does not create a conflict of interest because the interests of the shareholders and directors are aligned in obtaining the highest price"); *Krim v. ProNet, Inc.*, 744 A.2d 523, 528 n.16 (Del. Ch. 1999) (noting that a higher merger price "benefits the option-holding directors as much as, if not more than, the regular stockholders").

Similarly, the Board here had an incentive by virtue of their stock options to obtain the maximum merger consideration. Such an incentive aligns with the shareholder interest, especially as the Board considered financial analyses and discussed the benefits and risks of a REIT transaction before favoring the merger. There is no other evidence the Board sought to further their own personal interests at the expense of Life Time shareholders. Thus, the Court finds the facts alleged do not support a breach of the duty of loyalty claim against the Board.

### 2. Duty of Good Faith

The Court must next determine whether Plaintiffs' allegations that the Board allowed Akradi to control the merger and that the Board ignored the value of the real estate assets breached the Board's fiduciary duty of good faith.

Under Minnesota law, "'[g]ood faith' means honesty in fact in the conduct of the act or transaction concerned." Minn. Stat. § 302A.011, subd. 13; *see also Augustine v. Arizant Inc.*, 751 N.W.2d 95, 100 (Minn. 2008). "In fact, 'only a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a

reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability.'" *Markewich ex rel. Medtronic, Inc. v. Collins*, 622 F. Supp. 2d 802, 810-11 (D. Minn. 2009) (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996)). Breach of the duty of good faith is based "on a showing that the directors were conscious of the fact that they were not doing their jobs." *Id.* at 811 (quoting *Guttman v. Huang,* 823 A.2d 492, 506 (Del. Ch. 2003)).

Plaintiffs never pleaded that the Board acted dishonestly or that their actions rose to the level of conscious disregard of their duties. Instead, Plaintiffs allege that the Board acted inappropriately by: failing to allow a bidding war between Party A and the Buyout Group; failing to consider REIT analyses; abdicating the sales process to Akradi; and agreeing to deal protection devices with the Buyout Group.

With respect to Plaintiffs' allegations that the Board failed to allow a bidding war or consider REIT analyses, the law is clear that the Board is not liable for failing to carry out a perfect process, which would at most lead to an exculpated duty of care claim. *In re BJ's Wholesale Club, Inc. S'holders Litig.*, No. 6623-VCN, 2013 WL 396202, at *7 (Del. Ch. Jan. 31, 2013) ("[A]llegations that the Board should have done more, even if supported by well-pleaded facts, would, at best, only support a duty of care claim."). The Proxy states that the Board sought highest and best offers from Party A and the Buyout Group, Party A indicated that its best and final offer was $72.00 per share, (Proxy at 46), and the Board relied on financial analyses that indicated $72.10 was fair merger consideration, (*id.* at 48-49). Plaintiffs' allegation that the Board ignored the value of Life Time's real estate is conflicts with the Proxy's statement that the Board met with the

- 12 -

financial advisors Wells Fargo and Guggenheim to discuss the two merger proposals as well as a REIT conversion, (*id.* at 43), and considered the REIT analyses as well as the "uncertainties and risks associated" with a REIT conversion, (*id.* at 44).

Moreover, the Board did not breach the duty of good faith by allowing Akradi to privately negotiate terms with bidders. First, "it is appropriate for a board to enlist the efforts of management in negotiating a sale of control," *Wayne Cty. Emps.' Ret. Sys. v. Corti*, No. 3534-CC, 2009 WL 2219260, at *13 (Del. Ch. July 24, 2009), and "[i]t is well within the business judgment of the Board to determine how merger negotiations will be conducted, and to delegate the task of negotiating to the Chairman and the Chief Executive Officer," *In re NYMEX S'holder Litig.*, Nos. 3621-VCN, 3835-VCN, 2009 WL 3206051, at *7 (Del. Ch. Sept. 30, 2009). Moreover, Plaintiffs' allegations demonstrate that the Board established a Special Committee which, before deciding to approve the merger, engaged in discussions with financial advisors, evaluated financial reports and analyses, weighed the risks of a REIT transaction, and chose the timeframe and procedures for the merger. (*See* Am. Compl. ¶¶ 43-53; Proxy 40-47.) Such facts do not support a finding that the Board consciously disregarded its duties rising to a breach of good faith.

Finally, Plaintiffs assert that the Defendants improperly adopted devices such as a no-solicitation provision, a matching rights provision, and a termination fee. Nonetheless, "[t]he mere inclusion of such routine [deal protection] terms does not amount to a breach of fiduciary duty . . . . Delaware courts have recognized that these provisions are common in merger agreements, and may sometimes be necessary to secure

a strong bid." *In re Novell, Inc. S'holder Litig.*, No. 6032-VCN, 2013 WL 322560, at *10 (Del. Ch. Jan. 3, 2013). The Court agrees that adopting deal protection devices alone is not enough to rise to a level of "sustained or systematic failure of the board to exercise oversight" to satisfy a breach of good faith claim. *Collins*, 622 F. Supp. 2d at 810-11 (quoting *In re Caremark Int'l*, 698 A.2d at 971).

Thus, as Plaintiffs' pleading fails as a matter of law to support a nonexculpated breach of good faith claim or breach of loyalty claim against the Board, the Court will grant the Board's motion for judgment on the pleadings. The remaining issue is whether Akradi breached a fiduciary duty of loyalty or good faith to the shareholders.

## C. Akradi

Plaintiffs allege Akradi had a conflict of interest with Life Time's shareholders because, instead of pursuing a REIT transaction, Akradi forced an undervalued sale to his favored bidder to ensure his continuing interest in the surviving company. Although Plaintiffs assert these allegations support both a breach of loyalty and good faith claim, the claim is properly classified solely as a breach of loyalty claim.[7]

---

[7] The duty of loyalty prohibits a director from serving "personal interests at the expense of the corporation and its stockholders," *Bartholomew*, 2010 WL 3033727, at *3 (quoting *Diedrick*, 14 N.W.2d at 919). Akradi's purported conflict of interest appears to fall within such a claim. On the other hand, a breach of the duty of good faith requires dishonest conduct or a conscious disregard of performing director duties. *See* Minn. Stat. § 302A.011, subd. 13; *Collins*, 622 F. Supp. 2d at 810-11. Plaintiffs did not explain how Akradi's alleged conflict of interest also qualifies as dishonest conduct or a conscious disregard of his duties, and the Board authorized Akradi to negotiate terms with the bidding companies and his surviving interest in the company was disclosed to the shareholders in the Proxy. (*See* Proxy at 7-8, 40-43.)

The Court finds that, pursuant to Minn. Stat. § 302A.255, the disinterested Life Time shareholders ratified the transaction, precluding a breach of loyalty claim against Akradi. *See Holdahl v. BioErgonomics, Inc.*, No. 27-CV-10-24236, 2012 Minn. Dist. LEXIS 241, *34-35 (Minn. Dist. Ct. Feb. 8, 2012) ("The Director Defendants complied with the [Minn. Stat. § 302A.255] procedures for an interested director transaction and this Court may not, consistent with Minnesota law, second-guess the Special Committee's decision. Therefore, summary judgment must be granted on the breach of duty of loyalty claim for all of the Defendant Directors."), *aff'd*, No. A12-1495, 2013 Minn. App. Unpub. LEXIS 105 (Minn. Ct. App. Feb. 4, 2013).

Minnesota Statute § 302A.255, subd. 1, provides that "[a] contract . . . between a corporation and an organization in or of which one or more of its directors . . . have a material financial interest, is not void or voidable because the director or directors or the other organizations are parties" if the "material facts" of the transaction and the director's interest are "fully disclosed" and the transaction is approved by an affirmative vote by two-thirds of disinterested shareholders entitled to vote.

Here, the parties do not dispute that the disinterested Life Time shareholders – excluding Akradi's and the Board's shares – approved the transaction, with 81.65% voting in favor. Instead, Plaintiffs argue that the Life Time shareholders were not provided the "material facts" regarding the transaction for purposes of the statute. The only omissions Plaintiffs alleged to be "material" were the nondisclosure of Akradi's rollover agreement terms and the omission of the market value of Life Time's real estate assets from the Proxy. (Am. Compl. ¶¶ 75-84, 108.)

- 15 -

Although Minn. Stat. § 302A.255 does not define or explain what it means to fully disclose a material fact for purposes of shareholder ratification, Minnesota courts addressing materiality for breach of fiduciary duty claims have turned to federal law. *See Berreman v. West Publ'g Co.*, 615 N.W.2d 363, 371 (Minn. Ct. App. 2000) (discussing federal securities standard to determine materiality of undisclosed facts for plaintiff's breach of fiduciary duty claim against shareholders in close corporation); *Weiner v. Naegele*, No. 11-855, 2012 WL 2906299, at *5-6 (D. Minn. July 16, 2012) (applying federal standard to state law claim for breach of duty to disclose material facts brought against member of closely-held company); *Gottlieb v. Willis*, No. 12-2637, 2012 WL 5439274, at *3 (declining to hold that "Minnesota would impose a common-law duty to disclose information in a proxy statement beyond what is required by federal securities laws or relevant state statutes.") Plaintiffs have not offered – and the Court is not aware – of any Minnesota case suggesting a greater duty to disclose than that required by federal securities law.

The Court has already addressed and dismissed Plaintiffs' federal securities law claim that the Proxy allegedly omitted the full terms of Akradi's rollover agreement. The Court found that the "[s]hareholders had substantial information about Akradi's Rollover Agreement . . . and the proxy painted a 'sufficiently accurate picture so as not to mislead.'" *Lusk*, 213 F. Supp. 3d at 1132-33 (quoting *Lane v. Page*, 581 F. Supp. 2d 1094, 1121 (D.N.M. 2008)). Thus, paralleling federal securities law, the Court finds that by virtue of the Proxy, the shareholders were duly informed about Akradi's conflict of interest for purposes of Minn. Stat. § 302A.255. As the Court previously explained,

"Plaintiffs have not explained how a disclosure of the actual market value of Life Time's real estate would have substantially altered the total mix of information available. Indeed, shareholders were specifically apprised of potential outcomes of a REIT conversion transaction." *Id.* at 1131.

Therefore, as the shareholders' vote extinguishes the breach of the fiduciary duty of loyalty claim against Akradi pursuant to Minn. Stat. § 302A.255, the Court will grant Akradi's motion for judgment on the pleadings.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants Giles H. Bateman, Jack W. Eugster, Guy C. Jackson, John K. Lloyd, Martha A. Morfitt, John B. Richards, and Joseph S. Vassalluzzo's Motion for Judgment on the Pleadings [Docket No. 166] is **GRANTED**.

2. Defendant Bahram Akradi's Motion for Judgment on the Pleadings [Docket No. 160] is **GRANTED.**

3. Plaintiffs' claims are **DISMISSED with prejudice.**

DATED: August 6, 2017            _____s/John R. Tunheim_____  
at Minneapolis, Minnesota.            JOHN R. TUNHEIM  
           Chief Judge  
           United States District Court